Rehearing en banc granted by order filed 9/20/99;
published opinion filed 7/19/99 is vacated

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

ALEXIS A. BRUGAL; HENRY M.
ADAMES, M/O; REYNA M. DEJESUS,
F/O,
Defendants-Appellees.

No. 98-4255

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
David C. Norton, District Judge.
(CR-97-1042)

Argued: January 29, 1999

Decided: July 19, 1999

Before WIDENER, MURNAGHAN, and HAMILTON,
Circuit Judges.

_____

Affirmed by published opinion. Judge Murnaghan wrote the majority
opinion, in which Judge Widener joined. Judge Hamilton wrote a dis-
senting opinion.

_____

**COUNSEL**

**ARGUED:** Miller Williams Shealy, Jr., Assistant United States
Attorney, Charleston, South Carolina, for Appellant. Ann Briks
Walsh, Assistant Federal Public Defender, Charleston, South Caro-

lina; Barry Francis Kenyon, New York, New York; Jared Sullivan Newman, DAUGS, TEDDER & NEWMAN, Port Royal, South Carolina, for Appellees. **ON BRIEF:** J. Rene Josey, United States Attorney, Charleston, South Carolina, for Appellant.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Here we have an appeal by the government from the district court's suppression of evidence (drugs) found in the trunk of the defendants' car. The government contends that the defendants' actions -- i.e., exiting the interstate after apparently noticing drug checkpoint signs as well as other factors -- gave the police officers reasonable suspicion to search the vehicle. The defendants argue that each of the factors upon which the government relies is in itself innocent and that the factors when taken together simply do not add up to reasonable suspicion. After reviewing the briefs and the record, we conclude the district court's ruling suppressing the items turned up by the police in such a search was correct.

I.

Brugal and two passengers, Adames and DeJesus, were driving north on Interstate 95 near Ridgeland, South Carolina during the early morning hours of October 31, 1997. As they approached Ridgeland, South Carolina, their gasoline tank was three-quarters empty. Brugal exited the interstate at Exit 22, a decision he would later regret.

At approximately 3:00 a.m., the South Carolina Highway Patrol (SCHP) placed two "drug checkpoint ahead" signs on the side of Interstate 95 near Exit 22, which is in Ridgeland. The signs, which were placed at intervals of one thousand feet and five hundred feet before the exit were made visible to motorists by safety flares and reflective lettering.

There was no actual "drug checkpoint" on the interstate. Rather, according to one of the troopers, the SCHP employed the ruse to

2

investigate traffic violations. To that end, two SCHP officers, Sergeant Honeycutt (at whose direction the signs were placed) and Jackie Lynn Lawson, and Larry Shoemaker of the Ridgeland Police Department went to Exit 22's off ramp to create a traffic checkpoint. When cars exited the interstate, the officers would detain them to determine whether the drivers had committed any traffic violations and possibly whether any drugs were present.

Exit 22 led to Highway 17 South. The officers selected it because they considered it a "dead" exit -- i.e. , the service stations and other businesses to which its travel advisory sign led were closed. Although the stores were in fact closed, the district court found that a motorist using Exit 22 could reach the well-lit, 24-hour gas stations accessible from Exit 21.

Sergeant Honeycutt left the checkpoint at 3:20 a.m. to respond to an emergency elsewhere and left Trooper Lawson in charge of the checkpoint. Brugal took Exit 22 during Honeycutt's absence, leaving the interstate at approximately 3:30 a.m.[1]  Trooper Lawson stopped Brugal and requested his driver's license and the vehicle's registration. Brugal produced his valid driver's license, which was issued in New York, and his rental contract in lieu of the vehicle's registration.

Brugal gave Trooper Lawson his license and the rental contract. The rental contract stated that the car had been rented in Miami and was to be returned to Miami within the week. Trooper Lawson observed that Brugal had already paid the rental fee and was otherwise in compliance with the contract. Lawson then asked Brugal why he had left the interstate and where he was going. Brugal told Lawson that he needed fuel and was headed to Virginia Beach. Lawson

_____

[1] Brugal and the government dispute the location of the initial stop. Brugal argues that Trooper Lawson stopped the car while he was in the right lane of the exit ramp, which later merges into Highway 17 South. The government, on the other hand, argues that Trooper Lawson stopped Brugal near the stop sign at the end of the exit ramp. The district court noted the disagreement but did not make an express finding as to Brugal's exact location on the ramp. However, the district court's later discussion of Brugal's opportunity to seek gas on Highway 17 South indicates that it resolved the ambiguity in his favor.

3

returned Brugal's license but kept the rental contract. The trooper then looked into the vehicle, using his flashlight, and saw the three pieces of luggage that the three occupants had with them. Lawson then asked Brugal to pull over onto the shoulder of the road.

Brugal complied with Lawson's request and pulled off the road. Lawson then pulled his unmarked cruiser behind Brugal's car, turned on his headlights, and engaged the video camera mounted on the dash of his cruiser. Lawson then requested that the three defendants step out of the car, which they immediately did. He then asked Brugal if he could search the vehicle. Brugal told the trooper, "no problem." Trooper Lawson repeated his request to conduct a search, and Brugal again consented.

Trooper Lawson proceeded to search the interior of the vehicle, but found nothing. He then turned his attention to the three pieces of luggage in the vehicle. Two of the three bags contained packages slightly larger than bricks.[2] Believing that the packages contained illegal narcotics, Trooper Lawson arrested the defendants, impounded the vehicle, and confiscated the packages. Further examination revealed that the packages contained approximately eight kilograms of cocaine and one kilogram of heroin.

II.

All agree that the checkpoint stop was a seizure that triggered a Fourth Amendment analysis. See Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450 (1990). The analysis applicable here is that applicable to investigative detentions, since traffic stops more closely resemble investigative detentions than custodial arrests. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992), cert. denied, 506 U.S. 926 (1992). The officers' actions here were constitutional if the officers had reasonable suspicion that Brugal was engaged in criminal activity. See id. at 877. The government's challenge is to the district court's determination that the officers lacked reasonable suspicion to pull Brugal over further. Under the standard announced in Ornelas v.

_____

[2] The third bag contained women's clothes, but no incriminating materials.

4

<u>United States</u>, 517 U.S. 690, 699 (1996), we review reasonable suspicion determinations <u>de novo</u>. <u>See id.</u>

The government contends that the district court erroneously concluded that reasonable suspicion was absent. It points to ten factors that it claims constitute reasonable suspicion when viewed collectively. They are: (1) Brugal exited I-95 at the first available exit after the large, illuminated signs indicating that a drug checkpoint was ahead (although there really was no drug checkpoint); (2) It was 3:30 a.m.; (3) Exit 22 is a "dead" exit, <u>i.e.</u>, it has no open stores or gas stations, and there is little lighting at that time of morning; (4) Brugal was traveling north on I-95 from Miami, which is a major drug route from a major source city for drugs; (5) Brugal claimed that his fuel was low, but he had a quarter of a tank left; (6) Brugal passed two exits within the previous ten miles at which there were 24-hour gas stations whose signs were well lit and visible from the highway; (7) Brugal possessed a New York driver's license; (8) Brugal rented the car in Miami, which is a common pattern for drug dealers (<u>i.e.</u>, flying to Miami, renting a car and driving north); (9) Brugal and his two comrades had little luggage, yet claimed that they were traveling to Virginia Beach from Miami; and (10) The other persons who exited at Exit 22 were from South Carolina and were headed to a South Carolina destination.**3**

Brugal contends that the district court correctly found that reasonable suspicion was absent for the additional detention. He claims that none of those factors themselves are acts of wrongdoing and that even when viewed collectively, those factors apply to such a large number of innocent people that no suspicion should have arisen. <u>Compare</u>

_____

**3** Trooper Lawson testified that when Brugal exited the car after being asked to pull over for the second phase of the detention, he stretched in such a way as to set off a "red flag" in Lawson's mind. Lawson testified that he has been trained to interpret such movements by detainees, and that Brugal's stretch indicated that he was under stress. However, Brugal did not stretch until the officers already had made their decision to detain him further. Thus, Brugal's stretch does not factor into our analysis. Even if the stretch was an indication of nervousness, Brugal's circumstances -- he was pulled over by an officer on a dark exit ramp at 3:30 a.m. -- could well have caused that reaction.

Reed v. Georgia, 448 U.S. 438, 441 (1980) (holding that reasonable suspicion was absent where the police only had information that the defendant fit some of the drug courier profile characteristics and the defendant made some possibly evasive movements because of the possible applicability to large numbers of innocent people), with United States v. Sokolow, 490 U.S. 1, 9-10 (1989) (holding that completely innocent behavior did give rise to reasonable suspicion). But here no reasonable suspicion was revealed.

The Supreme Court has noted that "reasonable suspicion" is a term that defies precise definition, and describes it as"`a particularized and objective basis' for suspecting the person stopped of criminal activity." See Ornelas, 517 U.S. at 695-96 (citation omitted). Moreover, it is a term that contemplates the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Illinois v. Gates, 462 U.S. 213, 231 (1983) (citation omitted).

More specifically, under both Supreme Court and Fourth Circuit precedent, the determinations of police officers are entitled to some deference. Although the Supreme Court recently held that determinations of reasonable suspicion are subject to de novo review, it "hasten-[ed] to point out that a reviewing court should take care to . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." See Ornelas, 517 U.S. at 699. The Fourth Circuit has noted previously that in analyzing reasonable suspicion, it is important to "credit[ ] the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). The government would have us stop here and rule the search valid.

Even when deferring to the officers, however, we still conclude that they had insufficient reason to suspect that Brugal and his companions were involved in illegal activity when they ordered Brugal to pull over for further investigation. Brugal does not claim that the initial traffic stop was unconstitutional, and the district court found that it was proper under the Fourth Amendment. Trooper Lawson testified that he and the other officers had set up a traffic stop just off the ramp for Exit 22. The officers put up large, illuminated signs that stated that there was a drug checkpoint ahead (although there really was no

6

checkpoint on I-95 itself). The officers did not search -- or even request consent to search -- all exiting motorists for drugs; rather, they considered the checkpoint they established at the exit to be a traffic checkpoint. Thus, they checked motorists' driver's licenses and registrations, and released those motorists who had committed no traffic violations.

Traffic stops have a rather defined scope. We have held that when conducting such a stop, the police:

> may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

Rusher, 966 F.2d 868 at 876 (quoting United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988) (citations omitted)). As a result, Brugal, who had committed no traffic violations, was entitled to continue his journey unless the officers had a justifiable reason to suspect that he was engaged in illegal activity. See Rusher, 966 F.2d at 876-77.

The government's principal argument is that Brugal left the interstate in response to the drug checkpoint signs, which it claims that the district court found as a fact, and that fact alone justified the additional detention. However, that argument ignores two important points. First, the district court did not find that Brugal had in fact left the interstate for that reason, although it did find that the government was entitled to that inference for the purposes of the suppression hearing. Second, and more important, any inference that Brugal left the interstate for that reason should have been dispelled by the information gained at the traffic stop. We have concluded that reasonable suspicion was absent where we have found that the officers' additional investigation should have allayed their concerns about criminal activity. See United States v. Sprinkle, 106 F.3d 613, 618-19 (4th Cir. 1997).

That last point is very important here. Assuming that the requisite suspicion arose from Brugal's decision to exit the interstate when he

did, it certainly should have been allayed by Brugal's responses. After stopping Brugal and checking his driver's license and registration, Lawson asked Brugal why he selected Exit 22. Brugal told Lawson that he was low on fuel. Brugal, having driven a long way, was low on fuel -- his tank was three-quarters empty. Even the officers themselves later acknowledged that Brugal needed fuel.

The government responds to those facts by arguing that Brugal passed by two well-lit, visible all-night gas stations in the ten mile stretch preceding Exit 22. In particular, Exit 21, a mile south of Exit 22, led to such a gas station.

However, two facts render that argument insignificant. First, the travel advisory sign leading to Exit 22 indicates that gas is available at that exit. While those stations were closed at the time Brugal left the interstate, nothing in the record suggests that Brugal had any reason to know that.[4] Second, the well-lit all-night gas station to which Exit 21 led was accessible from Exit 22 and was visible from the top of Exit 22's ramp. Had Brugal been allowed to continue up the ramp, the very gas station to which the government refers would have been visible and accessible to him. In short, Brugal proffered a valid and easily verifiable (or refutable) reason for choosing Exit 22, and that reason should have allayed any concerns that he was engaging in illegal activity.

The government's other theory of Brugal's motives also falls short. It contends that reasonable suspicion existed to search Brugal because his rental of a car in Miami and subsequent travel north on Interstate 95 to New York, in the officers' experience, a common pattern followed by drug smugglers. Those smugglers rent cars in Miami for one-way travel and drive north on Interstate 95 to New York. However, two facts directly challenge that theory. First, there is no evidence that Brugal was traveling to New York. When asked where he was going, he told the officers that he and his passengers were on their way to Virginia Beach. Second, the rental contract -- with which Brugal had complied until he was stopped -- required Brugal to return the car to Miami within the week. One-way travel was not

_____

[4] It is not disputed that Brugal is not from the area, and the travel advisory sign does not indicate the gas station's hours of operation.

contemplated by the agreement. Thus, the facts before the officers establish that Brugal did not fit into their general pattern of drug trafficking behavior. Thus, neither Brugal's choice of exit nor mode of travel created reasonable suspicion even when viewed with the remaining factors below.

The dissent's arguments regarding Brugal's travel habits demonstrate the extent of speculation required to conclude that Brugal was engaged in illegal behavior. First, it argues that the police were properly suspicious of Brugal because he flew into Miami from New York, rented a car and drove north. <u>See</u> post at 15. However, nothing in the record even suggests that the police had any proof at the time of the search that Brugal had flown in from New York or had arrived in Miami from New York at any time close to his renting the car. At the time of the search, all the officers knew of Brugal's connection to New York was that he possessed a driver's license issued there. Thus, all the police knew was that they had a New York driver who rented a car in Miami. As even the dissent admits, there is nothing inherently suspicious or unusual about a New Yorker renting a car in Miami. <u>See</u> post at 14 ("Admittedly, standing alone, there is nothing atypical about an individual from New York City renting a vehicle in Miami. I am sure many individuals from New York City do so.").

Second, the argument with respect to Brugal's decision to rent the car for round-trip, rather than one-way travel, also points out the lack of reasonableness for suspecting illegal behavior. The dissent argues that Brugal may well have been an intelligent criminal attempting to outsmart police officers who were suspecting a one-way rental. However, were we to find that Brugal properly drew the officers' suspicion by renting the vehicle for round-trip travel when the officers believed that one-way travel was a hallmark of criminal activity, then we would essentially make him indistinguishable from almost every other person who rents a car. Most -- if not all-- automobile rental contracts call for either one-way or round-trip travel. Considering both choices to be equal marks of criminal activity only makes us return to the proposition that drivers licensed in New York who rent cars in Miami are suspicious. As stated above, we decline to brand all such drivers as criminals.

9

The remaining factors relied upon by the officers, even when viewed collectively, encompass such a "large category of presumably innocent travelers" that reasonable suspicion did not attach. Reid, 448 U.S. at 441. For example, the second, fourth and ninth factors (late night travel, travel from a source city and insufficient luggage for the trip, respectively) were the combination of factors present in Reid, and were rejected as a basis for finding reasonable suspicion even when viewed collectively. See id. at 441. **5** But see Lender, 985 F.2d at 154 (holding that lateness of hour is properly considered as a factor raising suspicion). We have even remarked that courts place too much reliance on travel from source cities. See United States v. Wilson, 953 F.2d 116, 126 (4th Cir. 1991). Even the government admits that the last factor -- that Brugal was licensed to drive by the state of New York -- is insignificant in itself. In light of the large number of drivers from New York, and the lack of any evidence that Brugal had any intention of returning there when he was stopped, we find that this factor adds little to the analysis even when combined with the other factors.

Given those facts, Brugal's case is distinguishable from those cases cited by the government where the Supreme Court has held (or we have held) that reasonable suspicion existed. None of the defendants in Terry v. Ohio, 392 U.S. 1, 7 (1967), United States v. Sharpe, 470 U.S. 675, 683 n.3 (1985), Sokolow, 490 U.S. at 9-10, or Lender, 985 F.2d at 153, provided the police with innocent explanations of their conduct, much less explanations that could be verified immediately to refute the suspicions. Moreover, Sharpe and Lender are further distinguishable because the defendants in those cases evaded the police after the police appeared and attempted to approach them. See Sharpe, 470 U.S. at 683, n.3 (stating that the defendant sped up as soon as the officer pulled behind him and his friend); Lender, 985 F.2d at 154 (stating that the defendant "turned his back" and began to leave when the police approached and "refused" to stop when the police requested that he do so). As a result, we find that reasonable suspicion did not

_____

**5** In Reid, the defendant (and his friend) flew into Atlanta from Fort Lauderdale, Florida (considered a source city for drugs) early in the morning. Both the defendant and his friend carried only a carry-on bag. See id. at 441.

10

exist to detain Brugal after his driver's license and rental contract were verified.

The final question is whether Brugal validly consented to the search. The district court did not reach the issue, but it is pressed here as an alternative basis for reversing the district court's determination. There is no question that Brugal told the officers that they may search the vehicle. However, that consent was given after he was pulled over to the side of the road for the additional detention that we have ruled illegal. While the Supreme Court has maintained that the voluntariness of a suspect's consent to search his belongings is a question of fact determined in light of all of the circumstances, see Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973), the Court has also invalidated consent by a suspect illegally detained. See Florida v. Royer, 460 U.S. 491, 507-08 (1983). We think that, under the circumstances of this case, Brugal's consent was also tainted by the illegal detention. In light of our decision, then, Brugal's consent subsequent to the illegal detention will not justify the search. Accordingly, the judgment is hereby

AFFIRMED.

HAMILTON, Circuit Judge, dissenting:

Because Trooper Lawson possessed reasonable suspicion that criminal activity was afoot, he was constitutionally entitled to direct Brugal to pull his vehicle over to the side of the road to conduct a further investigation. Because Brugal's subsequent consent to allow Trooper Lawson to search the vehicle was voluntary, the evidence seized during the search should not have been suppressed by the district court. Accordingly, I would vacate the district court's grant of Brugal's motion to suppress and remand for further proceedings.

I

The majority concludes that Brugal's continued detention after his license and rental agreement were verified was constitutionally improper. In reaching this conclusion, the majority does not contest, nor could it, the validity of the initial traffic checkpoint stop. See ante

11

at 6-7. Accordingly, we are concerned only with Trooper Lawson's decision to direct Brugal to pull his vehicle over to the side of the road.

It is settled that an ordinary traffic stop is a limited seizure and is more akin to an investigative Terry stop than a custodial arrest. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). This court therefore assesses the reasonableness of traffic stops under the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968). See Rusher, 966 F.2d at 875. Terry asks "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. "If the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the `fruit of the poisonous tree doctrine.'" Rusher, 966 F.2d at 875.

Once an officer effectuates a routine traffic stop, the officer "`may request a driver's license and vehicle registration, run a computer check, and issue a citation.'" Id. at 876 (quoting United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988)). Once the driver produces a valid license and proof that he is entitled to operate the vehicle, the driver must be permitted to proceed. See id. "Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." Id. at 876-77. "Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances." United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993). In assessing whether reasonable suspicion is present, we review the district court's findings of historical fact for clear error and the determination of reasonable suspicion de novo. See Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996).

The Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion. See United States v. Sokolow, 490 U.S. 1, 9 (1989) ("[A]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). In Sokolow, the defendant

12

was stopped at Honolulu International Airport by Drug Enforcement Administration (DEA) agents, who found a large amount of cocaine in his carry-on luggage. See id. at 3. The DEA agents had the following information before approaching the defendant: (1) he paid $2,100 cash for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only forty-eight hours, even though a round-trip flight from Honolulu takes twenty hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage. See id. The Court emphasized the necessity of considering the totality of the circumstances in order to evaluate the existence of reasonable suspicion. See id. at 8. The Court attached particular significance to the defendant's payment of cash, to the length of his trip, and to the agents' reasonable belief that he was traveling under an alias, considering these facts as "out of the ordinary." Id. at 8-9. Thus, as applied to this case, Sokolow teaches us that it is not enough that Trooper Lawson could articulate factors underlying his decision to instruct Brugal to pull his vehicle over to the side of the road if Trooper Lawson's articulated factors are not probative of behavior in which few innocent people would engage. The articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.

Trooper Lawson's decision to instruct Brugal to pull his vehicle over to the side of the road arose from the following circumstances: (1) I-95 is a major thoroughfare for narcotics trafficking; (2) Brugal was the only non-local or non-Charleston resident who got off at Exit 22 immediately after passing two well-lit decoy drug checkpoint signs in the northbound lane on I-95; (3) Brugal had a New York State driver's license; (4) Brugal rented the vehicle in Miami; (5) a common practice of drug couriers is to fly to Miami, acquire drugs, rent a vehicle, and drive north; (6) Brugal indicated that he was searching for gas even though he had a quarter tank of gas; (7) the Shell gas station referred to by the travel advisory sign cannot be seen from I-95, and the exit showed no signs of activity at 3:30 a.m.; (8) the defendants were traveling at 3:30 a.m.; and (9) Brugal and his passengers only had three small bags which, according to Trooper Lawson, was insufficient luggage for three persons, two males and one female, traveling from Miami to Virginia Beach.

13

In their totality, the factors articulated by Trooper Lawson eliminate a substantial portion of innocent travelers; therefore, Trooper Lawson possessed reasonable suspicion to instruct Brugal to pull his vehicle over to the side of the road to conduct a further investigation. Trooper Lawson observed Brugal exit I-95 immediately after passing two decoy drug checkpoint signs that were illuminated. Now, if the area around the exit following the decoy drug checkpoint signs showed signs of activity at 3:30 a.m., an indication that hotels, convenience stores, and gas stations were in operation, a limited significance could attach to leaving I-95 at such an exit. But, Exit 22 showed no signs of activity at 3:30 a.m. Because Exit 22 showed no signs of activity at 3:30 a.m., any driver's selection of this exit gets the reasonable suspicion juices flowing.

At the checkpoint, Brugal produced a New York State driver's license and a rental agreement indicating that the vehicle was rented in Miami by Brugal and that Brugal had a New York City address. While reviewing Brugal's license and rental agreement, Trooper Lawson asked Brugal where he was headed, and Brugal responded "Virginia Beach." Trooper Lawson then asked Brugal why he got off at Exit 22 if his destination was Virginia Beach, and Brugal responded that he did so in order to find gas. Trooper Lawson then noticed that Brugal had a quarter of a tank of gas.

At this point, based on his knowledge and experience, Trooper Lawson, who had been a State Trooper for eighteen years, had reasonable grounds to conclude that Brugal fit the profile of a drug courier from New York City who flew to Miami, rented a vehicle, and was attempting to return to New York City. Trooper Lawson testified that, based on his knowledge and experience, drug couriers fly to Miami from a northern destination, such as New York, to obtain drugs, rent a vehicle, and return north with the drugs. Admittedly, standing alone, there is nothing atypical about an individual from New York City renting a vehicle in Miami. I am sure many individuals from New York City do so. So these two facts, New York City resident and vehicle rental in Miami, standing alone, do not support the inference that Brugal was a drug courier who flew from New York City to Miami. However, these two facts must be considered with other facts observed by Trooper Lawson. Brugal's vehicle was stopped in South Carolina while traveling northbound on I-95 from

14

Miami at 3:30 a.m. I-95 is a major drug thoroughfare. At the checkpoint, Brugal informs Trooper Lawson that he is looking for gas. Although I-95 contained a traveler's advisory sign for a Shell gas station, several facts keep suspicions high. First, as noted above, Exit 22 showed no signs of activity at 3:30 a.m. Second, Brugal's vehicle had at least a quarter of a tank of gas. Third, Brugal just passed an exit, Exit 21, with several well-lit twenty-four hour gas stations. In light of these facts, any reasonable officer would remain suspicious of the driver's activities. In other words, a reasonable officer could conclude that few innocent travelers from New York City are traveling northbound on I-95 in South Carolina at 3:30 a.m. in a vehicle rented in Miami fourteen hours earlier,[1] exiting the interstate after passing two decoy drug checkpoint signs, and looking for gas at an exit that shows no signs of activity, even though they had just passed three well-lit gas stations and had at least a quarter of a tank of gas. In short, given the deference that this court is required to give to Trooper Lawson's experience, see United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (noting that we should "credit[ ] the practical experience of officers who observe on a daily basis what transpires on the street"), Trooper Lawson's conclusion that Brugal fit the profile of a drug courier from New York City who flew to Miami, rented a vehicle, and was attempting to return to New York City was eminently reasonable.

The reasonable conclusion that Trooper Lawson drew from his observations creates a rather out of the ordinary travel scenario for Brugal. Why would an individual from New York City fly to Miami, rent a vehicle, and drive to Virginia Beach? Obviously, one can conceive of instances where an individual from New York City would travel to Miami, rent a vehicle, and drive to Virginia Beach. For example, an individual from New York City could be driving an individual from Miami who wished to go to Virginia Beach and did not like to fly, ride on a train, ride on a bus, or drive alone. However, common sense tells us that it is significantly more probable that Brugal flew from New York City to Miami, a source city for drugs,

_____

[1] Brugal rented the vehicle at 1:36 p.m. on October 30, 1997. Therefore, between the time he rented the vehicle and the time he exited Exit 22, approximately fourteen hours had elapsed. The distance between Miami and Exit 22 is approximately 515 miles.

15

acquired drugs, and, instead of flying with the drugs on an airplane, rented a vehicle in Miami to transport the drugs to New York City.

The majority downplays this common sense interpretation of Brugal's travel itinerary in two ways. The majority first reasons that "there is no evidence that Brugal was traveling to New York." <u>Ante</u> at 8. However, as explained above, all the evidence suggests that Trooper Lawson had reasonable grounds to conclude that Brugal fit the profile of a drug courier from New York City who flew to Miami, rented a vehicle, and was attempting to return to New York City with drugs.

Second, the majority reasons that because Brugal's rental agreement required him to return the vehicle to Miami in a week, as opposed to dropping it off in New York City, Brugal's activities did not fit a "general pattern of drug trafficking behavior." <u>Ante</u> at 9. The flaw in the majority's analysis is revealed by examining two alternative explanations which place Brugal's activities squarely within a general pattern of drug trafficking behavior. First, if a one-way rental fits the drug courier profile (as opposed to simply renting a vehicle), an individual skilled in the drug trade would want to rent a vehicle on a round-trip basis to avoid suspicion. Thus, Brugal's plan could have been to, after the deal was consummated in New York City, drop the vehicle off at any Alamo car rental in New York City and pay the attendant penalty. Alternatively, Brugal's plan could have been to fly to Miami, acquire the drugs on the front, rent a vehicle, and drive to New York City with the drugs. After consummating a deal in New York City, Brugal would then drive to Miami instead of boarding a plane with the large amount of cash generated by a deal involving eight kilograms of cocaine and one kilogram of heroin. These two alternative explanations demonstrate Brugal's rental of the vehicle in Miami itself is relevant to the reasonable suspicion analysis and not the duration of Brugal's rental. Accordingly, the duration of Brugal's rental does not compel the conclusion that his activities did not fit a "general pattern of drug trafficking behavior." <u>Ante</u> at 9.**2**

_____

**2** If Brugal's rental agreement did in fact accurately reflect the length of time he intended to rent the vehicle in question, the three small pieces of luggage that Brugal and his passengers carried with them becomes more significant in the reasonable suspicion analysis. Obviously, a reasonable officer would find it unusual for three adults to carry only three small pieces of luggage for a week-long trip from Miami to Virginia Beach and back to Miami.

16

Under Sokolow, an officer's articulated factors in their totality must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied. In this case, Trooper Lawson's articulated factors met this burden. Indeed, few, if any, innocent individuals from New York City, fly to Miami, rent a vehicle to drive to Virginia Beach, proceed to drive most of the day and night on I-95, exit the interstate after passing two decoy drug checkpoint signs, and look for gas at an exit that shows no signs of activity at 3:30 a.m., when they have just past three well-lit gas stations and have at least a quarter of a tank of gas.

Finally, I must address the validity of Brugal's consent to the search. "A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant." United States v. Perrin, 45 F.3d 869, 875 (4th Cir. 1995); see also Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973). In assessing the voluntariness of an individual's consent, the court should examine the totality of the circumstances. See United States v. Mendenhall, 446 U.S. 544, 557 (1980); Schneckloth, 412 U.S. at 227.

After Brugal pulled his vehicle over to the side of the road, Trooper Lawson activated the mounted video camera in his vehicle which was now located directly behind Brugal's vehicle. Brugal then stepped out of his vehicle, and Trooper Lawson asked Brugal if he had any drugs in the vehicle. Trooper Lawson also asked Brugal if he could search the vehicle, and Brugal responded "no problem." Trooper Lawson repeated his request to search and, again, Brugal responded "no problem." During his search, Trooper Lawson discovered two pieces of luggage that contained packages slightly larger than bricks. It was later discovered these two pieces of luggage contained approximately eight kilograms of cocaine and one kilogram of heroin.

Nothing in the record suggests that Brugal did not voluntarily consent to the search. No evidence suggests that the police used coercive tactics to gain Brugal's consent. Under the facts of this case, the search of Brugal's vehicle was consensual and consistent with the Fourth Amendment.

17

II

In sum, because Trooper Lawson possessed reasonable suspicion that criminal activity was afoot, he was constitutionally entitled to direct Brugal to pull his vehicle over to the side of the road. Because Brugal's subsequent consent to allow Trooper Lawson to search the vehicle was voluntary, the evidence seized during the search should not have been suppressed by the district court. Accordingly, I would vacate the district court's grant of Brugal's motion to suppress and remand for further proceedings.

18