**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Alexis A. BRUGAL; Henry M. Adames,
M/O; Reyna M. DeJesus, F/O,
Defendants–Appellees.**

No. 98–4255.

United States Court of Appeals,
Fourth Circuit.

Argued: Oct. 25, 1999.

Decided: April 4, 2000.

**354**

**ARGUED:** Miller Williams Shealy, Jr., Assistant United States Attorney, Charleston, South Carolina, for Appellant. Ann Briks Walsh, Assistant Federal Public Defender, Charleston, South Carolina; Barry Francis Kenyon, New York, New York; Jared Sullivan Newman, Daugs, Tedder & Newman, Port Royal, South Carolina, for Appellees. **ON BRIEF:** J. Rene Josey, United States Attorney, Charleston, South Carolina, for Appellant.

Before WILKINSON, Chief Judge, WIDENER, MURNAGHAN, WILKINS, NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ, TRAXLER and KING, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Senior Judge HAMILTON wrote an opinion, in which Chief Judge WILKINSON and Judges WILKINS, NIEMEYER, TRAXLER, and KING joined. Judge LUTTIG wrote an opinion concurring in the judgment, in which Judge WILLIAMS joined. Judge MURNAGHAN wrote a dissenting opinion, in which Judges WIDENER, MICHAEL, and MOTZ joined.

## OPINION

HAMILTON, Senior Circuit Judge.

On October 31, 1997, Trooper Jackie Lynn Lawson (Trooper Lawson) of the South Carolina Highway Patrol discovered approximately eight kilograms of cocaine and one kilogram of heroin in a vehicle driven by Alexis Brugal (Brugal) and occupied by Henry Adames (Adames) and Reyna DeJesus (DeJesus). Trooper Lawson discovered the drugs during events immediately following a stop at a checkpoint on an exit ramp off Interstate 95 in South Carolina.

On November 20, 1997, a federal grand jury sitting in the District of South Carolina returned a two-count indictment charging Brugal, Adames, and DeJesus with conspiracy to possess cocaine with the intent to distribute, see 21 U.S.C. §§ 841(a)(1) and 846, and possession of cocaine with the intent to distribute, see id. § 841(a)(1). In January 1998, Brugal, Adames, and DeJesus each moved to suppress the drugs seized by Trooper Lawson. On February 26, 1998, the district court granted the motions, and the government appealed.

On July 19, 1999, a panel of this court affirmed. See United States v. Brugal, 185 F.3d 205 (4th Cir.1999). On September 20, 1999, a majority of the active circuit judges voted to rehear this case en banc. For the reasons stated below, we vacate the district court's order granting the defendants' motions to suppress and remand for further proceedings consistent with this opinion.

I

On October 31, 1997, at approximately 3:30 a.m., Brugal, Adames, and DeJesus were traveling northbound on Interstate

95 near Ridgeland, South Carolina. Brugal was driving, and Adames and DeJesus were passengers. As they approached Exit 22, they passed two signs, illuminated by safety flares and reflective lettering, reading "DRUG CHECKPOINT AHEAD." The first sign was placed 1000 feet before Exit 22, and the second sign was placed 500 feet before the exit.

There was no drug checkpoint on Interstate 95. Instead, at the direction of Sergeant John Hunnicut of the South Carolina Highway Patrol, Trooper Lawson and Officer Larry Shoemaker of the Ridgeland Police Department, established a checkpoint on Exit 22's exit ramp. The checkpoint was located at the end of the exit ramp just before the road forks. The checkpoint was established to verify the driver's license and vehicle registration of every motorist that got off at Exit 22. According to Trooper Lawson, the decoy drug checkpoint signs were placed on the interstate in hopes "that people carrying narcotics will become erratic, exit off the interstate, throw the narcotics out[, or . . .] cross the median and go back in the opposite direction."

Exit 22 was selected by the officers because they considered it a "dead exit." Unlike the exit preceding it, Exit 21, which has three well-lit twenty-four hour gas stations, the area around Exit 22 shows no signs of activity at 3:30 a.m. A traveler's advisory sign for Exit 22 on Interstate 95 indicates that a gas station is located at that exit, but it is closed at night and cannot be seen from the interstate at night.

After passing the decoy drug checkpoint signs, Brugal exited Interstate 95 at Exit 22. On Exit 22's exit ramp, Brugal was stopped at the checkpoint established by Trooper Lawson and Officer Shoemaker.[1] Trooper Lawson approached Brugal's vehicle and asked Brugal for his driver's license and vehicle registration. Brugal produced a New York State driver's license. In lieu of a vehicle registration, Brugal produced a rental agreement with Alamo Rent–A–Car indicating that the vehicle was rented by him in Miami, that he had a New York City address, and that the vehicle was to be returned to Miami on November 6, 1997.[2] While reviewing Brugal's driver's license and rental agreement, Trooper Lawson asked Brugal why he had left the interstate and where he was headed. Brugal responded that he needed gas and was headed for Virginia Beach. During his questioning of Brugal, Trooper Lawson noticed that the vehicle had a quarter of a tank of gas and three pieces of luggage in the rear cargo area. Trooper Lawson also noticed that Brugal was in full compliance with the terms of the rental agreement. However, believing he had reasonable suspicion that criminal activity was afoot, namely, the transportation of drugs, Trooper Lawson retained Brugal's rental agreement and instructed him to

1. Brugal's vehicle was the fifth vehicle stopped at the checkpoint, which was established at 3:00 a.m. on October 31, 1997. The driver of the first vehicle, who was driving from Florida to Orangeburg, South Carolina, had an invalid driver's license. The driver told Trooper Lawson he exited at Exit 22 because "he was nervous about not having a driver's license." The driver of the vehicle was issued a ticket for having an invalid driver's license. The vehicle was searched, but no weapons or contraband were found. The driver of the second vehicle initially did not stop at the checkpoint when the officers motioned for her to stop. She was a Ridgeland, South Carolina resident who had a valid driver's license, but no vehicle registration. The vehicle was searched, but no weapons or contraband were found. The third and fourth vehicles were driven by residents of Charleston, South Carolina. They were looking for Exit 33, the exit for Highway 17 north to Charleston, but Exit 22 is for Highway 17 south. These drivers had valid driver's licenses and vehicle registrations.

2. Brugal rented the vehicle in Miami at 1:36 p.m. on October 30, 1997. Therefore, between the time he rented the vehicle and the time he exited Exit 22, approximately fourteen hours had elapsed. The distance between Miami and Exit 22 is approximately 515 miles.

pull over to the shoulder of the road.[3] Approximately two minutes elapsed from the time Trooper Lawson initially approached Brugal's vehicle and the time Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road.

After Brugal pulled his vehicle over to the shoulder of the road, Trooper Lawson pulled his unmarked police cruiser behind Brugal's vehicle and activated the video camera mounted on the dashboard. Trooper Lawson then approached Brugal's vehicle and asked Brugal to "come out and talk to [him] for a minute." Brugal immediately exited his vehicle and walked with Trooper Lawson to the back of his (Brugal's) vehicle. Trooper Lawson momentarily returned to his cruiser to illuminate the cruiser's headlights. After doing this, Trooper Lawson approached Brugal and, while examining the rental agreement, asked him if he rented the vehicle in Miami, and Brugal responded in the affirmative. Brugal also indicated that he had just moved there from New York City. Trooper Lawson asked Brugal if he had weapons, drugs, or anything illegal in his vehicle, and Brugal responded that he did not. Trooper Lawson then asked Brugal if he could search the vehicle, and Brugal responded "no problem." Trooper Lawson repeated his request to search and, again, Brugal responded "no problem." Approximately two minutes elapsed from the time Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road and the time Brugal gave his consent to search.

Following Brugal's consent to search, Trooper Lawson asked Adames and DeJesus to exit the vehicle, which they immediately did. A protective pat-down was performed on Brugal and Adames, and DeJesus was asked to expose her waistband to allow the officers to see if she had a weapon there. A search of the vehicle was then performed by Trooper Lawson. During the search, Trooper Lawson discovered two pieces of luggage that contained packages slightly larger than bricks. It was later discovered these two pieces of luggage contained approximately eight kilograms of cocaine and one kilogram of heroin.

## II

### A

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of a person within the meaning of the Fourth Amendment. *See Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Thus, stopping a vehicle at a checkpoint constitutes a seizure of a person within the meaning of the Fourth Amendment. *See Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

Constitutional challenges to checkpoint seizures turn on whether the initial stop at the checkpoint was reasonable. *See Sitz,* 496 U.S. at 450, 110 S.Ct. 2481. Whether particular checkpoint seizures are reasonable is determined by balancing the gravity of the public interest sought to be advanced and the degree to which the seizures do advance that interest against the extent of the resulting intrusion upon the liberty interests of those stopped. *See id.* at 449–55, 110 S.Ct. 2481.

Applying this balancing analysis, the Supreme Court has upheld the constitutionality of government checkpoints set up to

---

**3.** In its opinion, the district court found that Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road be-

cause he had "a hunch that these Defendants were 3 'mules' transporting drugs."

detect drunken drivers, *see id.* at 454, 110 S.Ct. 2481, and illegal immigrants, *see Martinez–Fuerte,* 428 U.S. at 556–67, 96 S.Ct. 3074, so long as they involve no more than an "initial stop ... and the associated preliminary questioning and observation by checkpoint officers." *Sitz,* 496 U.S. at 450–51, 110 S.Ct. 2481. The seizure at the sobriety checkpoint upheld in *Sitz* lasted approximately twenty-five seconds, *see id.* at 448, 110 S.Ct. 2481, and the seizures at the immigration checkpoint upheld in *Martinez–Fuerte* lasted three to five minutes, *see* 428 U.S. at 544–48, 96 S.Ct. 3074.

The Supreme Court has also recognized that a state has a substantial interest in enforcing licensing and registration laws, though that interest is not substantial enough to justify roving patrol stops as an enforcement mechanism. *See Prouse,* 440 U.S. at 658–59, 99 S.Ct. 1391. But, the Court suggested in *Prouse,* albeit in *dicta,* that checkpoints to check driver's licenses would be permissible even in the absence of articulable and reasonable suspicion that a driver was unlicensed. *See id.* at 663, 99 S.Ct. 1391; *cf. Texas v. Brown,* 460 U.S. 730, 743, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) (noting that the circumstances surrounding stop at driver's license roadblock gave "no suggestion that the roadblock was a pretext whereby evidence of a narcotics violation might be uncovered in 'plain view' in the course of a check for driver's licenses"). Drawing on these authorities, courts have concluded that a brief stop at a checkpoint for the limited purpose of verifying a driver's license, vehicle registration, and proof of insurance is a reasonable intrusion into the lives of motorists and their passengers even in the absence of reasonable suspicion that a motorist or passenger is engaged in illegal activity. *See, e.g., United States v. Galindo–Gonzales,* 142 F.3d 1217, 1221

(10th Cir.1998) (brief detention of motorist to inspect driver's license, vehicle registration, and insurance information at an established license checkpoint comports with the Fourth Amendment); *United States v. McFayden,* 865 F.2d 1306, 1310–13 (D.C.Cir.1989) (same).

However, the Supreme Court has recognized that an initially permissible checkpoint seizure may transform into an impermissible one by further intrusions not based upon individualized suspicion or consent. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *see also Sitz,* 496 U.S. at 451, 110 S.Ct. 2481. Thus, when an officer seeks to expand the investigation of a motorist beyond the reasons for the checkpoint, the officer must have a reasonable suspicion that the particular person seized is engaged in criminal activity, *see Sitz,* 496 U.S. at 451, 110 S.Ct. 2481, or obtain consent during the time period the defendant is lawfully seized, *see Brignoni–Ponce,* 422 U.S. at 881–82, 95 S.Ct. 2574.

**B**

■ The district court analyzed this case as involving two seizures, the first occurring when Brugal's vehicle was stopped at the checkpoint; the second occurring when Trooper Lawson retained Brugal's rental agreement and instructed him to pull his vehicle over to the shoulder of the road. With respect to the first seizure, the district court held that "Trooper Lawson's initial seizure accompanied by a brief detention and limited questioning did not offend the Fourth Amendment."[4] With respect to the second seizure, the district court held that this seizure was constitutionally impermissible because, the purposes of the checkpoint—verification of a valid driver's license and vehicle regis-

---

4. The defendants concede that the initial stop effectuated by the checkpoint was legal and that Trooper Lawson was entitled to request Brugal's driver's license and vehicle registration to ensure that he was legally entitled to operate the vehicle he was driving. The de-

fendants also concede that Trooper Lawson was entitled to ask for consent to search during this verification process. In light of the defendants' concession that the police established a valid license checkpoint, we need not address the validity of the initial stop.

tration—having been fulfilled by the time Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road, Trooper Lawson did not have a reasonable suspicion that criminal activity was afoot, namely, the transportation of drugs. In reaching its ruling on the constitutionality of the second seizure, the district court analyzed eleven factors, which Trooper Lawson testified he observed prior to his decision to instruct Brugal to pull his vehicle over to the shoulder of the road, and which made him suspicious of the defendants' activities.[5] With respect to these eleven factors, the government argued they "collectively gave rise to Trooper Lawson's reasonable suspicion." The district court concluded that these eleven factors, in their totality, did not give rise to a reasonable suspicion that the defendants were transporting drugs. Rather, according to the district court, Trooper Lawson acted on a "hunch that these Defendants were 3 'mules' transporting drugs[;][h]e pulled them over and discovered that he was right."

The district court erroneously analyzed this case as involving two seizures. When the defendants were stopped at the checkpoint, they were seized within the meaning of the Fourth Amendment. *See Sitz,* 496 U.S. at 450, 110 S.Ct. 2481. Although the purposes of the checkpoint were fulfilled at the time Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road, the defendants were never "unseized," *i.e.,* free to go, at that time because Trooper Lawson retained Brugal's rental agreement. *See* S.C.Code Ann.

§ 56–3–1250 (requiring every motorist to possess a vehicle registration). Thus, from an analytical standpoint, instead of analyzing whether a second seizure was justified by reasonable suspicion, the district court should have analyzed whether the defendants' continued seizure was justified by reasonable suspicion. The district court's erroneous analytical framework is of no moment because whether we apply the district court's incorrect second seizure framework or the more appropriate continuing seizure framework, the seminal question in the case remains the same: whether Trooper Lawson had a reasonable suspicion that criminal activity was afoot, namely, the transportation of drugs, at the time he instructed Brugal to pull his vehicle over to the shoulder of the road.

C

■ The *Terry*[6] reasonable suspicion standard requires an officer to have a reasonable suspicion that criminal activity is afoot before he may conduct a brief investigatory stop of a person, *see* 392 U.S. at 30, 88 S.Ct. 1868, or continue to seize a person following the conclusion of the purposes of a valid stop, *see, e.g., United States v. Rusher,* 966 F.2d 868, 876–77 (4th Cir.1992) (holding that, during a routine traffic stop, the officer may request a driver's license and vehicle registration, run a computer check, and issue a citation, but that "[a]ny further detention for questioning is beyond the scope of the *Terry* stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime").

---

**5.** The eleven factors are: (1) Interstate 95 is a major thoroughfare for narcotics trafficking; (2) Brugal exited Interstate 95 after passing two well-lit decoy drug checkpoint signs; (3) Brugal had a New York State driver's license; (4) Brugal rented the vehicle in Miami; (5) the rental agreement indicated that Brugal had a New York City address; (6) a common practice of drug couriers is to fly to Miami, acquire drugs, rent a vehicle, and drive north; (7) Brugal indicated that he was searching for gas even though his vehicle had a quarter of a tank of gas; (8) Brugal just passed an exit, Exit 21, with several well-lit twenty-four hour

gas stations; (9) the gas station referred to by the travel advisory sign cannot be seen from Interstate 95, and the area around Exit 22 showed no signs of activity at 3:30 a.m.; (10) the defendants were traveling at 3:30 a.m.; and (11) Brugal and his passengers only had three small bags which, according to Trooper Lawson, was insufficient luggage for three persons, two males and one female, traveling from Miami to Virginia Beach.

**6.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow v. Illinois*, — U.S. —, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570 (2000). However, the *Terry* reasonable suspicion standard does require "a minimal level of objective justification" for the police action. *Id.* at 676. "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"'' of criminal activity." *Id.* (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). We have said that the *Terry* reasonable suspicion standard is "a commonsensical proposition," and that "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993).

The reasonable suspicion determination does not depend upon any one factor, but on the totality of the circumstances. *See United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In assessing whether reasonable suspicion is present, we review the district court's findings of historical fact for clear error and the determination of reasonable suspicion *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

The Supreme Court has recognized that factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion. *See Sokolow*, 490 U.S. at 9, 109 S.Ct. 1581 ("[A]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."); *see also Wardlow*, 120 S.Ct. at 677 ("*Terry* accepts the risk that officers may stop innocent people."). In *Sokolow*, the defendant was stopped at Honolulu International Airport by Drug Enforcement Administration (DEA) agents, who found a large amount of cocaine in his carry-on luggage. *See* 490 U.S. at 3, 109 S.Ct. 1581. The DEA agents had the following information before approaching the defendant: (1) he paid $2,100 cash for two airplane tickets from a roll of. $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami only forty-eight hours, even though a round-trip flight from Honolulu takes twenty hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage. *See id.* The Court emphasized the necessity of considering the totality of the circumstances in order to evaluate the existence of reasonable suspicion. *See id.* at 8, 109 S.Ct. 1581. The Court attached particular significance to the defendant's payment of cash, to the length of his trip, and to the agents' reasonable belief that he was traveling under an alias, considering these facts as "out of the ordinary." *Id.* at 8–9, 109 S.Ct. 1581. Thus, as applied to this case, *Sokolow* teaches that it is not enough that Trooper Lawson could articulate factors underlying his decision to instruct Brugal to pull his vehicle over to the shoulder of the road if Trooper Lawson's articulated factors are not probative of behavior in which few innocent people would engage. The articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied.

Trooper Lawson's decision to instruct Brugal to pull his vehicle over to the shoulder of the road was based on the following circumstances: (1) Interstate 95 is a major thoroughfare for narcotics trafficking; (2) Brugal exited Interstate 95 after passing two well-lit decoy drug checkpoint signs; (3) Brugal had a New York State driver's license; (4) Brugal rented the vehicle in Miami; (5) the rental agreement indicated that Brugal had a New York City address; (6) a common practice of drug couriers is to fly to Miami, acquire drugs, rent a vehicle, and drive north; (7) Brugal indi-

cated that he was searching for gas even though his vehicle had a quarter of a tank of gas; (8) Brugal just passed an exit, Exit 21, with several well-lit twenty-four hour gas stations; (9) the gas station referred to by the travel advisory sign cannot be seen from Interstate 95, and the area around Exit 22 showed no signs of activity at 3:30 a.m.; (10) the defendants were traveling at 3:30 a.m.; and (11) Brugal and his passengers only had three small bags which, according to Trooper Lawson, was insufficient luggage for three persons, two males and one female, traveling from Miami to Virginia Beach.

In their totality, the factors articulated by Trooper Lawson eliminate a substantial portion of innocent travelers; therefore, Trooper Lawson possessed reasonable suspicion to instruct Brugal to pull his vehicle over to the shoulder of the road to conduct a further investigation. Trooper Lawson observed Brugal exit Interstate 95 immediately after passing two decoy drug checkpoint signs that were illuminated. If the area around the exit following the decoy drug checkpoint signs showed signs of activity at 3:30 a.m., an indication that hotels, convenience stores, and gas stations were in operation, a limited significance could attach to leaving Interstate 95 at such an exit. But, the area around Exit 22 showed no signs of activity at 3:30 a.m. Because the area around Exit 22 showed no signs of activity at 3:30 a.m., Brugal's selection of this exit militates strongly in favor of finding reasonable suspicion. *Cf. Wardlow*, 120 S.Ct. at 676 ("Headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

At the checkpoint, Brugal produced a New York State driver's license. Brugal also produced a rental agreement indicating that he rented the vehicle in Miami, that he had a New York City address, and that the vehicle was to be returned to Miami on November 6, 1997. While reviewing Brugal's driver's license and rental agreement, Trooper Lawson asked Brugal why he had left the interstate and where he was headed. Brugal responded that he needed gas and was headed to Virginia Beach. During his questioning of Brugal, Trooper Lawson noticed that the vehicle had a quarter of a tank of gas and three pieces of luggage in the rear cargo area.

At this point, based on his knowledge and experience, Trooper Lawson, who had been a state trooper for eighteen years, had reasonable grounds to conclude that Brugal fit the profile of a drug courier from New York City who flew to Miami, rented a vehicle, and was attempting to return to New York City with drugs. Trooper Lawson testified that, based on his knowledge and experience, drug couriers fly to Miami from a northern destination, such as New York, to obtain drugs, rent a vehicle, and return north with the drugs. Admittedly, standing alone, there is nothing atypical about an individual from New York City renting a vehicle in Miami. We are sure many individuals from New York City do so. So these two facts, New York City resident and vehicle rental in Miami, standing alone, do not support the inference that Brugal was a drug courier who flew from New York City to Miami. However, these two facts must be considered with other facts observed by Trooper Lawson. Brugal's vehicle was stopped in South Carolina while traveling northbound on Interstate 95 from Miami at 3:30 a.m. Neither party disputes that Interstate 95 is a major drug thoroughfare and that Miami is a source city for drugs. At the checkpoint, Brugal informed Trooper Lawson that he was looking for gas. Although Interstate 95 contained a traveler's advisory sign for a gas station, three circumstances keep suspicions high. First and critically, Brugal chose to exit Interstate 95 at Exit 22, the first exit after the two decoy drug checkpoint signs. Second, the area around Exit 22 showed no signs of activity at 3:30 a.m. Third, Brugal's vehicle had at least a quarter of a tank of gas, and Brugal just

passed an exit, Exit 21, with several well-lit twenty-four hour gas stations. In light of these facts, any reasonable officer would remain suspicious of the driver's activities. In other words, a reasonable officer could conclude that few innocent travelers from New York City are traveling northbound on Interstate 95 in South Carolina at 3:30 a.m. in a vehicle rented in Miami fourteen hours earlier, exiting the interstate after passing two decoy drug checkpoint signs, and looking for gas at an exit that shows no signs of activity, even though they had just passed three well-lit gas stations and had at least a quarter of a tank of gas. In short, given the deference that this court is required to give Trooper Lawson's experience, *see Lender,* 985 F.2d at 154, Trooper Lawson's conclusion that Brugal fit the profile of a drug courier from New York City who flew to Miami, rented a vehicle, and was attempting to return to New York City with drugs was eminently reasonable.

The reasonable conclusion that Trooper Lawson drew from his observations creates a rather out of the ordinary travel scenario for Brugal. Why would an individual from New York City fly to Miami, rent a vehicle, and drive to Virginia Beach? Obviously, one can conceive of instances where an individual from New York City would travel to Miami, rent a vehicle, and drive to Virginia Beach. For example, an individual from New York City could be driving an individual from Miami who wished to go to Virginia Beach and did not like to fly, ride on a train, ride on a bus, or drive alone. However, common sense tells us that it is significantly more probable that Brugal flew from New York City to Miami, a source city for drugs, acquired drugs, and, instead of flying with the drugs on an airplane, rented a vehicle in Miami to transport the drugs to New York City. *See Wardlow,* 120 S.Ct. at 676 ("[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.").

Under *Sokolow,* an officer's articulated factors in their totality must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied. *See* 490 U.S. at 7–11, 109 S.Ct. 1581. In this case, Trooper Lawson's articulated factors met this burden. Indeed, few, if any, innocent individuals from New York City, fly to Miami, rent a vehicle to drive to Virginia Beach, proceed to drive most of the day and night on Interstate 95, exit the interstate after passing two decoy drug checkpoint signs, and look for gas at an exit that shows no signs of activity at 3:30 a.m., when they have just passed three well-lit gas stations and have at least a quarter of a tank of gas. Because Trooper Lawson had a reasonable suspicion that criminal activity was afoot when he directed Brugal to pull his vehicle over to the shoulder of the road, we see nothing constitutionally infirm about the defendants' continued seizure which permitted Trooper Lawson to conduct a further investigation into their activities and to request Brugal's consent to search.[7]

---

7. The defendants suggest that the rental agreement's duration (one week) and vehicle drop off point (Miami) are not indicative of criminal activity and negate any inference of criminal activity raised by their other conduct. We agree that a one week round-trip rental is not necessarily indicative of criminal activity. But, it certainly can be. For example, Brugal's plan could have been to fly to Miami, buy drugs, rent a vehicle with a one week round-trip rental agreement, drive to New York City, consummate a deal, and drop the vehicle off at any Alamo Rent–A–Car counter in New York City and pay the attendant drop-off penalty. Alternatively, Brugal's plan could have been to fly to Miami, acquire the drugs on the front, rent a vehicle with a one week round-trip rental agreement, and drive to New York City with the drugs. After consummating a deal in New York City, Brugal would then drive to Miami instead of boarding a plane with the large amount of cash generated by a deal involving approximately eight kilograms of cocaine and one kilogram of heroin. We do not agree, however, with the defendants' suggestion that the rental agreement's duration and vehicle drop off point negate any inference of criminal activity raised by their other conduct. Because Brugal's conduct could plausibly fit within one of the two alternative explanations

### D

■ We now turn to the validity of Brugal's consent to the search. "A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant." *United States v. Perrin*, 45 F.3d 869, 875 (4th Cir.1995); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 235, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In assessing the voluntariness of an individual's consent, we examine the totality of the circumstances. *See United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. Appropriate factors to consider include "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir.1996). The government need not produce evidence that the defendant "knew of his right to refuse consent to prove that the consent was voluntary." *Id.*

After Brugal pulled his vehicle over to the shoulder of the road, Trooper Lawson pulled his unmarked police cruiser behind Brugal's vehicle and activated the video camera mounted on the dashboard. Trooper Lawson then approached Brugal's vehicle and asked Brugal to "come out and talk to [him] for a minute." Brugal immediately exited his vehicle and walked with Trooper Lawson to the back of his (Brugal's) vehicle. Trooper Lawson momentarily returned to his cruiser to illuminate the cruiser's headlights. After doing this, Trooper Lawson approached Brugal and, while examining the rental agreement, asked him if he rented the vehicle in Mia-

mi, and Brugal responded in the affirmative. Brugal also indicated that he had just moved there from New York City. Trooper Lawson asked Brugal if he had weapons, drugs, or anything illegal in his vehicle, and Brugal responded that he did not. Trooper Lawson then asked Brugal if he could search the vehicle, and Brugal responded "no problem." Trooper Lawson repeated his request to search and, again, Brugal responded "no problem."

Nothing in the record suggests that Brugal did not voluntarily consent to the search. Indeed, no evidence suggests that the police used coercive tactics to gain Brugal's consent. *See United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir.1996) (explaining that "the absence of official coercion is a *sine qua non* of effective consent"). Under the facts of this case, the search of Brugal's vehicle was consensual and consistent with the Fourth Amendment. *See, e.g., United States v. Wilson*, 895 F.2d 168, 172 (4th Cir.1990) (holding that the defendant's consent, which was given when the defendant shrugged his shoulders and raised his arms in response to the officer's request to pat the defendant down, was voluntary because the officer was dressed in plain clothes, made no threats, displayed no weapons, and asked for consent in public).

### E

Finally, we must address the logic of the opinion concurring in the judgment. In his opinion, Judge Luttig concludes that the search was permissible because Brugal's consent was obtained during a consensual encounter between Brugal and Trooper Lawson. His conclusion is premised on two propositions. First, his conclusion is premised on the proposition that the purposes of the checkpoint—verification of a valid driver's license and vehicle registration—were fulfilled after, not be-

described above, the rental agreement's duration and vehicle drop off point do not resolve the questions raised by Brugal's highly suspicious, out-of-the-ordinary conduct. There-

fore, *Terry* permitted Trooper Lawson to detain the defendants further "to resolve the ambiguity." *Wardlow*, 120 S.Ct. at 677.

fore, Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road. Second, his conclusion is premised on the proposition that Trooper Lawson returned Brugal's rental agreement before his consent was given. We will address each of these propositions in turn.

A review of the record, in particular the district court's opinion, leads to the inexorable conclusion that the purposes of the checkpoint—verification of a valid driver's license and vehicle registration—were fulfilled before Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road. In its opinion, the district court opined that reasonable suspicion was necessary to justify the "second seizure," *i.e.,* Trooper Lawson's decision to instruct Brugal to pull his vehicle over to the shoulder of the road. The only logical conclusion to be drawn from the district court's analysis is that the district court was of the opinion that the purposes of the checkpoint were fulfilled before the second seizure began; otherwise, the district court would have examined the case employing an entirely different analysis. If the district court believed that the purposes of the checkpoint were fulfilled after Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road, the subject of reasonable suspicion never would have come up; rather, the district court would have analyzed whether Trooper Lawson took the necessary steps to fulfill the purposes of the checkpoint before and after he ordered Brugal to pull his vehicle over to the shoulder of the road.

Our inquiry on this point need not proceed further. However, two additional points are further instructive. First, the district court's opinion is noticeably devoid of any finding that Trooper Lawson was even remotely concerned about Brugal's authority to operate the vehicle, either before or after he requested Brugal to pull his vehicle over to the shoulder of the road; nor did the district court find, or even suggest, that Trooper Lawson's deci-

sion to instruct Brugal was motivated by such a concern. If the district court believed that Trooper Lawson possessed genuine concerns regarding Brugal's authority to operate his vehicle, we are confident that the district court would have made some type of finding that Trooper Lawson harbored such a concern. We are likewise confident that, if the district court believed that Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road to conduct a further investigation into Brugal's authority to operate his vehicle, the district court would have made a finding in this regard. However, the district court made it clear in its order what motivated Trooper Lawson to instruct Brugal to pull his vehicle over to the shoulder of the road: "[Trooper Lawson] acted on a hunch that these Defendants were 3 'mules' transporting drugs. He pulled them over and discovered that he was right." This finding concerning Trooper Lawson's motivation, which by no means is a "summary observation," *post* at 367 n.3, is further buttressed by Trooper Lawson's testimony regarding the eleven factors that made him suspicious of the defendants' activities and his testimony that he only asked motorists to pull over to the shoulder of the road if he felt there was "reasonable suspicion, or [he could] gather reasonable suspicion." Second, the district court made a specific finding that Trooper Lawson observed that Brugal had a valid driver's license and "was in full compliance with the terms of the rental contract." This finding suggests that once Trooper Lawson observed that Brugal possessed a valid driver's license and vehicle registration, the purposes of the checkpoint were fulfilled.

In the face of the irrefutable conclusion that the purposes of the checkpoint were fulfilled before Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road, Judge Luttig concludes otherwise. In so doing, he completely ignores the district court's factual findings and the import of its legal analysis. In-

deed, Judge Luttig's opinion does not even address the significance of the district court's findings or legal analysis; instead, he relies on portions of Trooper Lawson's testimony that were not addressed by the district court.

According to Judge Luttig, Trooper Lawson must have instructed Brugal to pull his vehicle over to the shoulder of the road in an effort to ensure that Brugal was legally entitled to operate the vehicle because he retained Brugal's rental agreement, but returned his driver's license. While acknowledging that Trooper Lawson was never asked why he retained the rental agreement, but returned Brugal's driver's license, Judge Luttig suggests that "the most (if not the only) reasonable inference given the otherwise counter-intuitive return of the driver's license but retention of the rental agreement, is that Lawson had remaining questions about the validity of that document, the legitimacy of Brugal's possession of that document, or the legality of Brugal's possession of the car itself in light of the information that appeared on that document—none of which would necessarily have been answered by the facts that Brugal was able to produce a facially valid driver's license and a rental agreement." *Post* at 367.

Judge Luttig's retention of the rental agreement/return of the driver's license analysis is seriously flawed, if not "counter-intuitive" in its own right. First and critically, it altogether ignores the legal analysis engaged in by the district court.

As noted above, if the district court was of the opinion that Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road in order to ask additional questions concerning Brugal's authority to operate his vehicle, the district court would have engaged in a different legal analysis and, at a minimum, would have made some type of finding in this regard. It did neither. Second, Judge Luttig's rationale ignores the fact that there are equally plausible reasons why Trooper Lawson decided to retain Brugal's rental agreement, but return Brugal's driver's license. For example, Trooper Lawson testified that a common practice of drug couriers is to fly to Miami, acquire drugs, rent a vehicle, and drive north. In light of this testimony, one could reasonably conclude that Trooper Lawson retained Brugal's rental agreement not because he wanted to question Brugal regarding his authority to operate the vehicle, but rather, because he wanted to continue to question Brugal to ascertain whether he was a drug courier. Similarly, Trooper Lawson's follow-up question—did you rent the vehicle in Miami—which Judge Luttig suggests confirms Trooper Lawson's motivation—is consistent with an attempt to ascertain whether Brugal fit a drug courier profile. Third, Judge Luttig's analysis ignores the district court's finding that Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road because he "acted on a hunch that these Defendants were 3 'mules' transporting drugs."[8]

**8.** It bears reiterating that Judge Luttig reaches the conclusion that the purposes of the checkpoint were fulfilled after Trooper Lawson ordered Brugal to pull his vehicle over to the shoulder of the road by completely ignoring the district court's factual findings and the import of its legal analysis. Judge Luttig rationalizes that we are not bound by anything the district court did because the district court did not make a specific finding that the purposes of the checkpoint were fulfilled before Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road, even though all of the relevant indicators discussed throughout this opinion make this fact irrefutable. *See post* at 368 ("[B]ecause the district court did not *find* that the stop had ended before Trooper Lawson ordered Brugal to pull off the road, we are not bound by anything the district court might have thought, even if we could divine such."). Needless-to-say, unlike Judge Luttig, we do not so cavalierly dismiss the import of the district court's factual findings and its legal analysis; nor do we, as Judge Luttig does, displace the district court as the trier-of-fact by weighing the credibility of the witnesses. In fact, we think we have adhered to well-established principles of appellate review in reaching the conclusion that the purposes of the checkpoint were fulfilled before Trooper

We now turn to the second proposition supporting Judge Luttig's conclusion that the search was permissible because Brugal's consent was obtained during a consensual encounter between Brugal and Trooper Lawson—that Trooper Lawson returned Brugal's rental agreement before his consent was given. For this proposition, Judge Luttig relies on Trooper Lawson's testimony that he returned Brugal's rental agreement after Brugal stated he had rented the vehicle in Miami.

It is not entirely clear from the record whether Trooper Lawson *ever* returned Brugal's rental agreement, and the district court never made a finding on this point.[9] The defendants vigorously contend that Trooper Lawson never returned the rental agreement to Brugal, but Judge Luttig is correct that Trooper Lawson testified that he did. The video of the encounter does not show that Trooper Lawson did in fact return the rental agreement. Under these circumstances, neither we, nor Judge Luttig, are in a position to make a finding that

Trooper Lawson returned Brugal's rental agreement. If we did, we would encroach upon the province of the district court, something we decline to do.[10]

## III

Because Trooper Lawson possessed reasonable suspicion that criminal activity was afoot, he was constitutionally entitled to direct Brugal to pull his vehicle over to the shoulder of the road. Brugal's subsequent consent to allow Trooper Lawson to search the vehicle was voluntary, therefore, the evidence seized during the search should not have been suppressed by the district court. Accordingly, the district court's order granting the defendants' motions to suppress is vacated and the case is remanded for further proceedings consistent with this opinion.

*VACATED AND REMANDED.*

LUTTIG, Circuit Judge, concurring in the judgment:

---

Lawson ordered Brugal to pull his vehicle over to the shoulder of the road. *Cf. Cochran v. Morris*, 73 F.3d 1310, 1315 (4th Cir.1996) (*en banc*) (holding that the nature of the defendant's complaint, the *sua sponte* nature of the district court's dismissal, and the peremptory nature of the district court's dismissal, lead to the irrefutable conclusion that the district court dismissed the plaintiff's complaint pursuant to 28 U.S.C. § 1915(d) and not Federal Rule of Criminal Procedure 12(b)(6) even though the two sentence dismissal order contained the sentence "[t]he plaintiff now makes further complaints regarding the defendants, none of which states a claim for which relief can be granted").

9. Judge Luttig does not suggest that the district court made a finding on this point. The district court's failure to do so is understandable. Once the district court reached the conclusion that the purposes of the checkpoint were fulfilled before Trooper Lawson instructed Brugal to pull his vehicle over to the shoulder of the road, whether Trooper Lawson returned Brugal's rental agreement became irrelevant.

10. Judge Luttig states that it is ironic that we do not mention the dissent in this opinion, but

do engage in an "impassioned critique" of his opinion. *Post* at 369. We fail to see the irony in all of this. The dissent in this case is two paragraphs long and embraces the reasoning of the now vacated panel majority opinion. *See post* at 369. Our opinion completely addresses the reasoning of that now-vacated opinion. But, on the other hand, Judge Luttig's opinion breaks new ground, concluding that: (1) the purposes of the checkpoint were not fulfilled before Trooper Lawson ordered Brugal to pull his vehicle over to the shoulder of the road; and (2) Trooper Lawson returned Brugal's rental agreement. This opinion provides us with the first opportunity to respond to these new conclusions. And, interestingly, the dissent does not in any way, shape, or form adopt Judge Luttig's conclusions that: (1) the purposes of the checkpoint were not fulfilled before Trooper Lawson ordered Brugal to pull his vehicle over to the shoulder of the road; and (2) Trooper Lawson returned Brugal's rental agreement. Rather, the dissent agrees with us that the principal question presented in this appeal is whether Trooper Lawson had a reasonable suspicion that criminal activity was afoot, namely, the transportation of drugs, at the time he instructed Brugal to pull his vehicle over to the shoulder of the road. *See post* at 369.

If one conceptualizes the initial investigatory detention of Brugal and Trooper Lawson's subsequent request that Brugal pull his car to the side of the road as two separate and distinct seizures, as did the district court and as do the appellees, or if one views the events in question as but one single seizure and Trooper Lawson's request as a continuation of that one seizure beyond the completion of the routine investigatory stop, as does the plurality herein, then I do not believe that there existed reasonable suspicion sufficient to support the so-called second seizure or the continuation of the investigatory stop. In other words, contrary to the view of the plurality, I do not believe that the circumstances identified by the government and accepted by the plurality as confirmatory of reasonable suspicion in fact support such a suspicion. However, based upon the actual record testimony in this case, it is clear not only that there were not two separate and distinct seizures, but also that the single seizure that did occur was, throughout its duration, a valid investigatory stop, for which no reasonable suspicion was necessary. For this reason, and not for that relied upon by the plurality, I am satisfied that there was no violation of the Fourth Amendment, and therefore no need for suppression of the evidence seized pursuant to the indisputably voluntary consensual search of Brugal's vehicle.

The appellees and the plurality contend, and the district court may have believed (although it did not so find), that the purposes of the investigatory stop had been fulfilled, and thus that reasonable suspicion was necessary to justify any further detention, at the time Trooper Lawson asked Brugal to pull from the middle of the lane of traffic and onto the shoulder of the road. Based upon the record testimony, however, it is plain that the initial investigatory detention, which, it bears repeating, the appellees themselves concede was lawful, remained in progress until Trooper Lawson returned the rental agreement to Brugal—well after Lawson asked Brugal to pull to the side of the road.

The investigatory detention began, as must any routine traffic stop, with Trooper Lawson asking Brugal for his driver's license and registration. See J.A. 34.[1] Brugal produced his driver's license, but "was having difficulty finding a registration." J.A. 35. Trooper Lawson saw that Brugal had a rental agreement for the car, however, and informed him that the agreement would be sufficient. See J.A. 35 ("I told him the rental agreement would be fine, instead of a registration.").

Having determined that Brugal's New York driver's license appeared valid, Trooper Lawson promptly returned the license to Brugal. See J.A. 35. However, having noticed that the rental agreement showed that a car had been rented in Miami, Trooper Lawson retained the rental agreement, a document that is considerably more difficult to examine at a glance in the middle of a lane of traffic, and asked Brugal to pull his car over to the shoulder of the exit ramp. See J.A. 35 ("I noticed at that time that he had ... rented the vehicle out of Miami. I asked him to pull over to the side there and I returned his driver's license to him at that time, but I kept the rental agreement. He pulled over.").[2]

---

1. All citations to the joint appendix refer to the testimony of Trooper Lawson, unless otherwise noted.

2. The district court never focused on whether Trooper Lawson asked or directed Brugal to pull to the side of the road. The court variously stated that Trooper Lawson "asked," see J.A. 380, and "ordered," see J.A. 382, Brugal to pull off the road. Trooper Lawson testified that he merely "asked" Brugal to pull his car out of the lane of traffic. See J.A. 35. Given Trooper Lawson's unrebutted testimony and the absence of any contrary finding by the district court, I think that the better supported conclusion is that Lawson merely asked Brugal to pull over and that Brugal was, at that point, free to leave. However, my analysis does not hinge on the fact that Trooper Lawson merely requested that Brugal pull over. Given that the investigatory stop

Trooper Lawson was never asked below why he retained the rental agreement, but returned the driver's license—presumably the very opposite of what he would do if he had concluded at that moment that he either was possessed, or would imminently be possessed, of reasonable suspicion that a crime had been committed. However, the most (if not the only) reasonable inference given the otherwise counter–intuitive return of the driver's license but retention of the rental agreement, is that Lawson had remaining questions about the validity of that document, the legitimacy of Brugal's possession of that document, or the legality of Brugal's possession of the car itself in light of the information that appeared on that document—none of which would necessarily have been answered by the facts that Brugal was able to produce a facially valid driver's license and a rental agreement—and that he was understandably unwilling to attempt to resolve these questions while standing in the pitch dark, in the middle of an exit ramp, exposed to moving traffic. As the government poignantly explains:

> It seems obvious why Lawson asked Brugal to pull his vehicle off the exit ramp and onto the adjacent grassy area. Although it was late and there was little traffic, other vehicles had exited the ramp. It was dangerous for Lawson to be in the middle of the road with Brugal's vehicle during early morning hours. No doubt, Lawson could have told Brugal to pull off the road immediately after

was still underway at the time Brugal pulled off the road, even an order directing him to do so would have been justifiable as necessary to the safe and complete fulfillment of the purposes of such a stop.

**3.** The plurality apparently believes that the district court's remark that "[Trooper Lawson] acted on a hunch that these defendants were 3 'mules' transporting drugs," J.A. 390, constitutes a "finding concerning Trooper Lawson's motivation," *ante* at 363; *see also ante* at 356 n.3. Read in context, however, it is plain that the district court's statement on which the plurality relies is not a factual finding to which we owe deference, as the

approaching the vehicle for his safety, as well as that of Brugal and his passengers.

Appellant's Br. at 11 n. 7.

That Trooper Lawson asked Brugal to pull out of the lane of traffic for the specific purpose of completing the limited investigatory stop is confirmed by two significant facts. First, the question that Trooper Lawson asked Brugal immediately *after* asking him to pull off the road, but before returning the rental agreement to him, was designed to elicit further information relevant to the rental agreement, specifically whether Brugal had in fact rented the car in Miami, as the documentation showed: "I asked him where he was ... coming from...." *See* J.A. 35. And, second, of utmost significance, once Trooper Lawson asked this follow-up question and, from Brugal's answer to that question, determined that there was nothing to suggest that the rental agreement was anything other than genuine and valid, Lawson promptly returned the rental agreement to Brugal, *see* J.A. 36, as he had earlier returned Brugal's driver's license, freeing Brugal to continue on his way.[3]

Although for some reason the plurality is, itself, absolutely convinced that Trooper Lawson had completed the investigatory stop before he asked Brugal to pull over to the side of the road, it cannot and does not contend that the *district court* so found. The plurality maintains only that the dis-

plurality suggests. The statement is nothing more than a summary observation following the district court's legal analysis, not a finding of fact. And, insofar as an appellate court is concerned, it is the absence of a finding per se on this question that is significant; it is not for us to make inferences concerning the district court's subjective state of mind in the absence of findings.

In any event, and more importantly, that Trooper Lawson may have been possessed of a hunch regarding the defendants says nothing at all as to whether he did or did not have further questions that fell within the scope of a permissible investigatory stop at the time he ordered Brugal to pull off the road.

trict court must have believed that the stop was completed. *See ante* at 362–63 ("The only logical conclusion to be drawn from the district court's analysis is that the district court was *of the opinion that* the purposes of the checkpoint were fulfilled before the second seizure began.") (emphasis added); *ante* at 363 (calling "inexorable" and "irrefutable" the conclusion that the purposes of the checkpoint were fulfilled before Trooper Lawson ordered Brugal to pull off the road). And notwithstanding the plurality's confidence in its ability to discern the unstated view of the district court, the district court simply did not make any finding as to when the purposes of the stop were fulfilled; the district court stated only that "Trooper Lawson saw that Brugal had rented the car in Miami and was in full compliance with the terms of the rental contract." J.A. 379. The footnote to that sentence recites *specifically* what the district court found that Trooper Lawson had observed:

> Specifically, the contract was fully paid, was valid until November 6, 1997, listed Brugal as the only authorized driver, and required that the car be returned to Miami.

J.A. 379 n. 3. The district court thus most certainly did not find that the purposes of the investigatory stop had been completed. And just as with the question whether the district court found that Trooper Lawson acted on a "hunch" that the defendants were drug couriers, it bears emphasis that, on the question whether the stop had ended, form and substance merge. That is, because the district court did not *find* that the stop had ended before Trooper Lawson ordered Brugal to pull off the road, we are not bound by anything the district court might have thought, even if we could divine such.

Moreover, the "equally plausible" explanations offered by the plurality to account for Trooper Lawson's decision to return Brugal's license, but to retain his rental agreement, *see ante* at 364, are anything but "equally" plausible. The plurality posits that, because it is a common practice for drug dealers to fly to Miami, rent a car there, and drive north with drugs, Trooper Lawson may have retained Brugal's driver's license, and asked his follow-up question, to ascertain whether Brugal was a drug courier. *See ante* at 364. However, contrary to the plurality's representations, this account in no way explains the decision to return the license but to retain the rental agreement. It is true that the rental agreement goes to one element of drug courier behavior noted above: renting a car in Miami. But the driver's license was equally relevant to ascertaining whether Brugal fit that profile, as it showed that he most likely traveled to Miami from somewhere else—New York. Moreover, if Trooper Lawson's concern was simply to detain Brugal because he suspected illegal behavior, he presumably would not have returned Brugal's driver's license. If the retention of any one document was more likely to keep Brugal from fleeing, surely that one document was the license, and not the rental agreement.

Because it is apparent that Trooper Lawson asked Brugal to pull out of the lane of traffic for the limited purposes of examining Brugal's rental agreement and asking any necessary follow-up questions relevant to that document—and appellees do not even suggest that these purposes were pretextual—it is evident that the investigatory stop did not end until Trooper Lawson returned Brugal's rental agreement, having determined that all was in order with respect to that document. At that moment, and not before, did the traffic stop conclude.

Appellees wisely (because the record would not support such) and tactically (because to do so would direct attention to the single factor that establishes the continuity of the stop) do not even contend that the investigatory stop ended, and that they were seized again, constructively, when Trooper Lawson returned Brugal's driver's license but withheld return of the rental agreement. To hold, as appellees

do urge, that the lawful investigatory stop ended upon Trooper Lawson's return of Brugal's driver's license and that a second unlawful seizure began simply because Lawson asked Brugal to pull to a safe location out of the lane of traffic in order to examine Brugal's vehicle documentation, would be not just to withhold from law enforcement officers the very authority they must have to effectuate the purposes of the investigatory stop—the authority to pose those questions necessary to determine that the vehicle is in full compliance with the law—but the authority they must have to ensure that compliance without jeopardy to their own life or limb.

Of course, following Lawson's return of the rental agreement to Brugal, Brugal was not even arguably further detained without his consent. After returning the rental agreement, Trooper Lawson did ask Brugal whether there were any weapons or drugs in the car. *See* J.A. 38 ("I returned his rental agreement and asked him if he had any drugs or weapons in the vehicle."). At that point, however, by all objective measures, Brugal was not being detained and was free to leave, and there is nothing in the record that even hints that Brugal himself did not understand as much. And it was immediately after this question that Trooper Lawson asked Brugal—who obviously still remained free to leave—for permission to search the car, and, in response, twice received Brugal's unequivocal consent. *See* J.A. 39 ("I asked him since you don't have any drugs or weapons in your vehicle do you mind if we search your vehicle? . . . . He said, no problem. I asked him a second time. He said, no problem.").

Accordingly, given that Trooper Lawson never exceeded the permissible scope of a lawful investigatory stop and that the drugs at issue were discovered as a result of a consensual search of Brugal's car which was conducted at a time when the appellees were unquestionably free to leave, it is apparent that no violation of the Fourth Amendment occurred and that the drugs were therefore wrongfully suppressed by the district court. For these reasons would I reverse the judgment under review.

And lest the more casual reader be confused by the plurality's ironically impassioned critique of my analysis (in contrast, the plurality does not even as much as mention the dissent), it bears reminding that, were the plurality to prevail in its efforts to convince me that the investigatory stop had indeed ended before Trooper Lawson asked Brugal to pull over to the side of the road, I would not, as the plurality evidently believes, join its opinion. I would instead join Judge Murnaghan's *dissent*, because, as I state above, I am firmly of the view that reasonable suspicion did not exist to justify any further detention beyond that necessary to complete the lawful investigatory stop.

Judge Williams joins in this opinion.

MURNAGHAN, Circuit Judge, dissenting:

I respectfully dissent for the reasons stated in the panel majority opinion. *United States v. Brugal*, 185 F.3d 205 (4th Cir.1999). Brugal was lawfully detained at a traffic checkpoint. After Brugal produced a valid driver's license and vehicle rental agreement, the police retained the rental agreement and instructed Brugal to pull his car onto the shoulder of the highway. The continued detention of Brugal was lawful only if the police possessed reasonable suspicion that criminal activity was afoot.

I agree with the district court that the factors relied upon by the officers do not add up to reasonable suspicion and do not serve to protect a substantial portion of innocent travelers from the intrusion of a police investigation. I must conclude, therefore, that Brugal's continued detention was unconstitutional, and I would accordingly affirm the suppression of the evidence subsequently found in the defendant's trunk.

Judges Widener, Michael and Motz join in this dissent.