UNITED STATES of America,

v.

Christopher LESTER.

No. CR. 99–1242JKB.

United States District Court,
D. Maryland.

June 19, 2001.

Captain Michael D. Mierau, Jr. for the United States of America.

James Wyda, Esquire, Federal Public Defender, Kathryn Frey Balter, Esquire, Assistant Federal Public Defendant, for defendant.

## *MEMORANDUM OPINION AND ORDER*

GAUVEY, United States Magistrate Judge.

The defendant, Christopher Lester, stands charged with two misdemeanors: driving while intoxicated in violation of Maryland Transportation Article, section 21–902, and driving in violation of a restricted license in violation of Maryland Transportation Article, section 16–113(h), which statutes have been assimilated into federal law. 18 U.S.C. § 13. Pursuant to Fed. R. Cr. P. 12(b)(3), defendant moves to suppress any and all tangible and derivative evidence and statements seized from Mr. Lester's person and car on the grounds that the stop was made without a warrant, probable cause or reasonable suspicion in violation of the Fourth Amend-

ment to the United States Constitution. The precise issue is whether Mr. Lester's U-turn, lawfully executed 1,500 feet away from a temporary gate check set up at a point of entry into a military installation for security reasons, gives rise to reasonable, articulable suspicion to justify the stop of his vehicle by military police.

Based on the following findings of fact and discussion of the applicable law set forth below, the Court grants the motion and finds that the vehicle stop in question was not based on a justified, articulable suspicion and therefore violated the defendant's rights under the Fourth Amendment to the Constitution. Consequently, all evidence gathered from the illegal stop shall be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### FACTS [1]

The Court makes the following findings of fact:

(1) On August 22, 1999, Sgt. Reid and two other military police officers were performing duties in conjunction with a gate check set up at the Rockenbach Road entrance to Ft. George G. Meade military base.

(2) The Rockenbach Road entrance does not contain a permanent gate. Rather, this entrance to the military base is designated by two brick signs located on either side of the roadway. Those brick signs indicate simply "Ft. Meade." The boundaries of Ft. Meade begin before the Rockenbach entrance; however, there is no signage that Mr. Lester would have necessarily seen, alerting him to the fact that he

---

1. The parties reached a stipulation as to the key facts and allowed proffer of additional    facts without rebuttal.

had entered the military base, before the brick signage.

(3) The purpose of the gate check on August 22, 1999, was to check personnel identification and vehicle registration on all vehicles entering the military installation through this entrance. Only cars entering the military base (or traveling southbound) were subject to the check. The gate check was set up pursuant to a heightened security alert known as Threat Condition Alpha. Threat Condition Alpha or "Threat–Con" issued in response to terrorist threats on the United States Government.

(4) The gate check was located at the bottom of a low grade hill. An approaching motorist would be unable to see the Ft. Meade gate check until he or she was at the crest of the hill approximately 2000 feet from the brick signs. Flares were set up in the roadway by the signs at the bottom of the hill. There was no notice of the gate check or the purpose of the gate check prior to the check itself, and nothing at the check reveals the purpose of the check.

(4) There are no intersecting roads between the crest of the hill and the gate check.

(5) One of the patrol cars at the Rockenbach entrance, was situated on the shoulder of the road, next to one of the brick signs; a second patrol car was situated in the outer lane adjacent to the first. Both patrol cars had flashing lights on. The third patrol car, Sgt. Reid's, was parked near the top of the hill approximately 1500 feet away from the brick signs (toward the outer perimeter of Ft. Meade), and approximately 500 feet from the crest of the hill.

(6) On August 22, 1999, at 3:05 a.m., Sgt. Reid stopped defendant's vehicle (which had been traveling southbound to-ward the Ft. Meade signs) after defendant executed a u-turn on the crest of the grade of the hill. Sgt. Reid stated that he stopped the defendant's vehicle because he "believed that the defendant was attempting to avoid the gate check and that this avoidance was motivated by criminal activity." However, Sgt. Reid observed no erratic or unsafe driving other than the question of the timing of the u-turn. When the defendant executed the u-turn, he was approximately 1500 feet away from the gate check. Upon contact with the defendant, Sgt. Reid detected alcohol on defendant's breath. The defendant performed poorly on the field sobriety tests, and the breathalyzer test resulted in a .15 BrAC.

(7) Sgt. Reid filled out three violation notices: one for violation of Maryland Transportation Article, section 21–902, driving under the influence, a second for violation of Maryland Transportation Article, section 16–113, driving on a restricted license, and a third for violation of Maryland Transportation Article, section 21–602(b), making a prohibited u-turn on the crest of the hill.

(8) The charge of making a prohibited u-turn on the crest of the hill was dismissed on the government's motion as a u-turn is legal if the vehicle is visible from 500 feet in either direction when the u-turn is made. The government has conceded that there is reasonable doubt as to whether the vehicle was not visible from 500 feet in either direction. Consequently, the government does not argue that probable cause existed to stop the defendant's vehicle for this traffic violation.

## ANALYSIS

The question presented is whether defendant's U-turn, executed 1,500 feet before an unannounced gate check or roadblock designed to prevent entry of

terrorists or other persons presenting a security risk to the military installation, provided reasonable suspicion to validate the vehicle stop under *Terry v. Ohio.* The Government does not argue that this stop presents one of those "limited circumstances where suspicionless stops are permissible [such as highway sobriety checkpoints or border patrol checkpoints]." *United States v. Wilson,* 205 F.3d 720, 723 (4th Cir.2000). Nor does the Government argue that Sgt. Reid had probable cause or reasonable articulable suspicion that Mr. Lester had violated a traffic law, specifically an illegal u-turn. *United States v. Whren,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Hassan El,* 5 F.3d 726, 729 (4th Cir. 1993). "Rather, the Government takes the position that based on the defendant's u-turn, reasonable suspicion existed to facilitate a *Terry* stop," (Opposition, n. 2 & 3) as "Sgt. Reid believed that the defendant was attempting to avoid the gate check and that this avoidance was motivated by criminal activity." (Opposition, 3). A u-turn alone, the Government contends, provides sufficient suspicion under plenary state authority. *(Id.)*

## A. GENERAL PRINCIPLES OF FOURTH AMENDMENT JURISPRUDENCE

The Government not only misreads the state authority it cites as establishing a *per se* rule, but more fundamentally ignores Supreme Court precedent eschewing a *per se* rule, and steadfastly retaining a totality of the circumstances approach. A review of key Supreme Court cases demonstrates the error of the Government's position.

■ Because courts consider a traffic stop to be a limited seizure, the reasonableness of the stop is assessed under the standards enunciated in the Supreme Court decision of *Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny: the officer must have a reasonable suspicion, based on articulable facts, of criminal activity. *See United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. King,* 119 F.3d 290, 293–94 (4th Cir.1997). Articulable suspicion is less than what is required for probable cause,[2] but there must be at least a "minimal level of objective justification" for making the stop. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). *Accord United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.") This reasonable suspicion standard is based largely on the common sense and experience of the investigating officer. *See Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000); *United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity.' " *Wardlow,* 120 S.Ct. at 675–76 (2000).

■ Whether there is reasonable suspicion under *Terry* depends on the totality of the circumstances. "But the essence of all

---

**2.** The Supreme Court has defined "probable cause" as "a fair probability that contraband or evidence of a crime will be found." *Illi-* *nois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

that has been written is that the totality of the circumstances—the whole picture— must be taken into account." *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Brugal,* 209 F.3d 353, 359 (4th Cir.2000).

## B. A U–TURN PRIOR TO A ROAD-BLOCK DOES NOT CONSTITUTE REASONABLE SUSPICION PER SE UNDER TERRY

Counsel for both sides cite to cases largely in state courts that have dealt with avoidance of police roadblocks or sobriety check points. The Government argues this Court should join the *majority* of states that have determined "a turn made to avoid a road check does *by itself* provide reasonable suspicion to implement a *Terry* stop." [3] (Opposition at 3.) (emphasis added). As defense counsel ably points out in her opposition, the Government's authority for this "majority" view does not support

such a sweeping declaration of the state of the law. And, as the Court stated above, federal precedent demands a case-by-case examination of all the facts.

Of the eight cases the Government cites for this "majority" view,[4] on close examination only *Boches, Oughton, Coffman* and perhaps *Snyder*[5] can be read to announce a *per se* rule that a u-turn before a road-block is alone sufficient basis for an investigatory stop. In the other four cases, there were facts in addition to the u-turn, which the Courts identified as contributing to a reasonable suspicion. *Smith v. State,* 515 So.2d 149 (Ala.Crim.App.1987) (In addition to a u-turn, Court noted that the driver stopped in a driveway of a private home, some 50 feet from the front door, turned off his lights, but not his engine and remained in the car); *State v. Hester,* 245 N.J.Super. 75, 584 A.2d 256 (App.Div. 1990) (Court remanded to determine whether a reasonable motorist would have been aware that police procedure in effect

3. In its opposition, the Government explicitly "concedes that there is reasonable doubt involving the distance from which defendant's car was visible when the turn was made." As such, the Government does not argue that probable cause existed to seize the defendant for this traffic violation. [Rather] ... that based on the defendant's U-turn, reasonable suspicion existed to facilitate a *Terry* stop. (Opposition at 3, n. 2.)

In light of the government's concession, the Court cannot rely on any illegality of the defendant's u-turn as tending to show "reasonable suspicion."

4. The Government cites to the following cases: *State v. Thill,* 474 N.W.2d 86 (S.D. 1991); *Boches v. State,* 506 So.2d 254 (Miss. 1987); *Oughton v. Director of Revenue, State of Mo.,* 916 S.W.2d 462 (Mo.Ct.App.1996); *Steinbeck v. Commonwealth,* 862 S.W.2d 912 (Ky.Ct.App.1993); *State v. Hester,* 245 N.J.Super. 75, 584 A.2d 256 (App.Div.1990); *Snyder v. State,* 538 N.E.2d 961 (Ind.Ct.App.1989); *Coffman v. State,* 26 Ark.App. 45, 759 S.W.2d 573 (Ct.App.1988); and *Smith v. State,* 515 So.2d 149 (Ala.Crim.App.1987).

5. While the *Snyder* opinion does state that "a driver's attempt to avoid the roadblock, by making a turn around, does raise a 'specific and articulable fact' which gives rise to a reasonable suspicion," 538 N.E.2d at 965, the opinion continues: "Trooper Maxwell testified that he had pursued and stopped drivers on numerous occasions who sought to avoid roadblocks and inevitably those drivers had suspended or expired licenses, or some other violation of the law." *Id.* at 963–64. His experience gave him a basis from which he could form a reasonable suspicion that Snyder was committing a crime. Such might not always be the case when an officer sees a driver avoid a police roadblock. Likewise, a driver who simply turns off the road before entering the roadblock may not give rise to a reasonable suspicion, unless coupled with other articulable facts such as erratic driving or traffic violations. A finding of a reasonable suspicion must be determined on a case by case basis.

required all motorists to proceed through checkpoint); *State v. Thill,* 474 N.W.2d 86 (S.D.1991) (Court noted not only the turnabout at the entrance to the roadblock, but also "his subsequent circuitous route"); *Steinbeck v. Commonwealth,* 862 S.W.2d 912 (Ky.Ct.App.1993). (Court noted not only his turn, but the fact that he turned onto an unpaved and uninhabited road, at 1:00 a.m.)

Further, five of the eight cases, including *Oughton* and *Snyder,* involved u-turns before sobriety checkpoints. Recognizing the important societal goal of sobriety checkpoints, the Supreme Court has upheld the constitutionality of suspicionless vehicle stops at highway sobriety checkpoints. *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). Moreover, courts have recognized that the effectiveness of sobriety checks is grossly reduced if drivers are permitted to avoid them. "Common sense draws one to the conclusion that permitting motorists to choose whether they desire to cooperate with a checkpoint will reduce its effectiveness, detract from its deterrent effect, and, on occasion, create safety hazards." *State v. Hester,* 245 N.J.Super. 75, 584 A.2d 256, 259 (App. Div.1990). *Accord Steinbeck v. Commonwealth,* 862 S.W.2d 912, 914 (Ky.Ct.App. 1993) ("If police officers stationed at roadblocks were not permitted to stop such [evading] drivers, the very drivers the police seek to deter could flagrantly avoid the roadblocks and the stops would lose their deterrent effect."). Hence, sobriety checkpoint cases are inopposite authority.

In the other three cases on which the Government relies, the courts did uphold investigatory stops of vehicles who appeared to turn when confronted with roadblocks to check for tags, inspection stickers, driver's licenses and equipment violations. But, as with sobriety stops, the purpose of such investigatory stops would be frustrated if a driver could avoid them.

The purpose of the roadblock at issue here, of course, was to prevent entry onto Ft. Meade of terrorists. The roadblock has served its purpose if terrorists are deterred from entry by the roadblock itself.

■ The security roadblock here is more akin to the search procedures for entry to correctional facilities. *See, e.g., Gadson v. State,* 341 Md. 1, 668 A.2d 22 (1995). There the Maryland Court of Appeals held that absent reasonable, articulable suspicion of criminal activity, it is unreasonable under the Fourth Amendment to detain visitors who, prior to entering the prison, indicate a preference to leave rather than submit to a "canine sniff" of the vehicle. In reaching this conclusion, the court explained that: "[i]f the purpose of the dog sniff was, as the State contends, to prevent the flow of drugs into the prison, then that purpose was fully served once [the defendant] agreed to turn around a quarter mile away from the prison building. At that point, the checkpoint had accomplished its stated goal." *Id.* at 28. *See also United States v. Miles,* 480 F.2d 1217, 1219 (9th Cir.1973) (per curiam) (noting that searches required as a condition of entrance to a secure area of a military base are reasonable as long as individuals are given the option of avoiding the search by electing not to seek entry).

In sum, the Court agrees with defendant that there is no majority view that a u-turn by itself prior to a security roadblock provides reasonable suspicion sufficient for a *Terry* stop.

## C. FOURTH AMENDMENT JURISPRUDENCE REQUIRES A CASE–BY–CASE CONSIDERATION OF ALL THE FACTS

■ In any event, a *per se* rule, defendant argues, has no place in Fourth

Amendment jurisprudence. Rather, the law dictates that the Court should examine the specific facts of the case to determine whether Sgt. Reid had reasonable suspicion to justify the vehicle stop based on the totality of the circumstances. (Response at 8.) The Court agrees.

The defendant has distilled from the body of state case law several factors which courts have identified and discussed in considering whether an investigatory stop was justified: distance between lawful turn and roadblock; notice of the roadblock; unsafe, erratic driving or other driver error; and police officer experience, among others. Under these several factors, the stop here was not justified.

■ As to the first factor, the rule seems to be the farther away a motorist is from the roadblock, the less objectively reasonable it is to infer that the turn was made out of a consciousness of guilt. In concluding that there was no reasonable and articulable suspicion to justify the seizure of the defendant and the vehicle, the court in *Howard v. Voshell* "consider[ed] the lack of an identifiable way for a police officer to determine whether motorists 1,000 feet away from the checkpoint *truly had notice of what lay ahead to be significant.*" 621 A.2d 804, 807 (Del.Sup.Ct.1992) (emphasis added). Likewise, in *State v. Binion,* the Court found that "the evidence did not establish specific and articulable facts upon which to base a reasonable suspicion that the defendant had *intentionally avoided* the roadblock to evade arrest or detection" where the motorist made a safe, lawful turn 1,000 feet before the roadblock. 900 S.W.2d 702, 706 (Tenn.App.1994) (emphasis added). *See also State v. Miller,* 1996 WL 75344 (Tenn.App.1996) (no reasonable suspicion where turn made 2,000 feet before roadblock); *Murphy v. Commonwealth,* 9 Va.App. 139, 384 S.E.2d 125 (1989) (350 feet): *Bass v. Commonwealth,*

259 Va. 470, 525 S.E.2d 921 (2000) (550 feet); *State v. Lear,* 722 A.2d 1266 (Me. 1998) (600 feet); *State v. Powell,* 591 A.2d 1306 (Me.1991) (2,100 feet); *State v. Talbot,* 792 P.2d 489 (Utah App.1990) (1,320 feet).

Conversely, the closer a motorist is to a roadblock when he or she turns, the more objectively reasonable it may be to infer the turn was made out of a consciousness of guilt. In *State v. Thill,* the court found reasonable suspicion when, in combination with other factors, the motorist turned just 350 feet before the roadblock. 474 N.W.2d 86 (S.D.1991). *See also Snyder v. State,* 538 N.E.2d 961 (Ind.App.1989) (reasonable suspicion where turn, in combination with other factors, made 300 feet from roadblock); *Steinbeck v. Commonwealth,* 862 S.W.2d 912 (Ky.App.1993) (300 feet); *Smith v. State,* 515 So.2d 149 (Ala.App. 1987) (600 feet); *Commonwealth v. Eaves,* 13 Va.App. 162, 408 S.E.2d 925 (1991) (approximately 500 feet); *Stroud v. Commonwealth,* 6 Va.App. 633, 370 S.E.2d 721 (1988) (150 feet); *State v. Hester,* 245 N.J.Super. 75, 584 A.2d 256 (App.Div.1990) (3–400 feet).

■ As to the second factor, the question of whether a notice was posted is relevant to the assessment of a driver's scienter or guilt. In *Hester,* the issue of posted notice was dispositive and required remand for further fact finding where the motorist made a turn 3–400 feet from a roadblock. 245 N.J.Super. 75, 584 A.2d 256. In *Snyder,* reasonable suspicion was found where a turn was made 300 feet from a roadblock, after passing posted notice. 538 N.E.2d 961. On the other hand, in *Howard,* the court found that a turn made 1,000 feet from a roadblock was too far to give rise to objective belief that motorist know what lay ahead for turn to be significant. 621 A.2d at 807. In *Talbot,* there existed no reasonable suspicion

where, among other things, there was no sign giving notice of what lay ahead. 792 P.2d 489.

■ As to the third factor, unsafe, erratic driving is thought to militate towards a finding of reasonable suspicion. In *Smith,* reasonable suspicion existed where motorist stopped and turned off lights but not his engine after he made a rapid turn into a private driveway. 515 So.2d 149. *See also Stroud, supra* (abrupt turn). On the other hand, a u-turn in the absence of any unsafe or erratic driving has been found not to constitute reasonable suspicion to conduct a stop. *See Powell, supra.* (no erratic driving); *Bass, supra.* (no violation of traffic or other law); *Miller, supra.* (no unlawful conduct); *Murphy, supra.* (no driver error); *Lear, supra.* (safe driving); *Binion, supra* (nothing unlawful or erratic

in the manner of turn, therefore, under the totality, no reasonable suspicion).

Finally, the Courts give weight to an officer's inference based on his experience. *Compare Binion, supra* (no reasonable suspicion where nothing in police officer's personal experience led him to believe defendant was avoiding roadblock), *with Steinbeck, supra* (police officer experience is a factor supporting reasonable suspicion).

■ Citing to the relatively far distance between the u-turn and the gate check (1500 feet), the lack of posted notice of the roadblock, and the fact that defendant was not violating any other traffic laws at the time or driving erratically or in an unsafe manner, the defendant argues the factual circumstances did not give rise to reasonable suspicion.[6] (Response at 14–17.)

6. Defendant discusses cases from six states, demonstrating strikingly similar fact situations, where courts have invalidated a stop. *See Bass v. Commonwealth,* 259 Va. 470, 525 S.E.2d 921 (2000) (no reasonable suspicion where, 500 feet from roadblock, motorist made a series of legal driving maneuvers the effect of which was to reverse direction—turned left into gas station parking lot, didn't stop, traveled through it, and reversed course—finding "reasons for which a driver may reverse direction other than to evade a traffic checkpoint are legion in number and are a matter of common knowledge and experience" thus, considering the totality, the most the government established was a "hunch" that the driver chose to avoid the checkpoint); *Murphy v. Commonwealth,* 9 Va. App. 139, 384 S.E.2d 125 (1989) (lawful turn made 350 feet from roadblock "does not give rise to a reasonable suspicion of criminal activity"; lawful turn may have justified a "hunch" that the driver was in violation of the laws but standing alone doesn't rise to the necessary reasonable suspicion); *State v. Lear,* 722 A.2d 1266 (Me.1998) (no reasonable suspicion where u-turn made 600 feet before roadblock finding that the "officer's suspicion of criminal activity based solely on defendant's u-turn was not objectively reasonable.") and *State v. Powell,* 591 A.2d 1306 (Me.1991) (adopting the lower court's holding

that no reasonable suspicion existed where left turn into driveway to reverse course made 2,100 feet before roadblock at 10:15 p.m., no erratic driving, and driver complied with command to stop, because "although the officer may have suspected that Powell reversed his direction to avoid the roadblock, the [lower] court did not find that suspicion reasonable. The court found that the most the officer reasonably could conclude from Powell's actions was that he turned around in the face of police lights and cruisers in the distance."); *State v. Miller,* 1996 WL 75344 (Tenn.App. 1996) (unpublished) (no reasonable suspicion where turn made 2,000 feet before the roadblock into another roadway, where officers saw no other unlawful conduct, because there was an absence of factors indicating defendant turned with intent to avoid roadblock; the officer's claim of "suspicious activity" based on "merely deduc[ing] that those who turned off the road were more likely violators" was only a "mere hunch" under *Terry* and thus could not pass constitutional muster); *State v. Binion,* 900 S.W.2d 702 (Tenn. App.1994) (upon application of several factors, no reasonable suspicion where turn made into parking lot located 1,000 feet from roadblock because distance does not suggest driver turned to "intentional[ly]" avoid the roadblock, because no other driver error, and because the place where the roadblock was

This Court agrees: the stop in question violated the Fourth Amendment because it was not supported by reasonable suspicion. The undisputed facts of the case are that defendant executed a u-turn after cresting a hill, 1,500 feet before a temporary gate check to a military installation. Sgt. Reid did not observe any erratic or unsafe driving, and other than the u-turn itself, defendant did not display any other behavior that rose to the level of suspicion necessary to justify a *Terry* stop.

In support of its contention that the defendant's action constituted avoidance of the gate check, and that such "avoidance" gave rise to reasonable suspicion, the Government relies heavily on the recent decision of *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In that case, the Supreme Court upheld an investigatory stop where the defendant's "headlong flight" from police in an area of heavy narcotics trafficking gave rise to reasonable suspicion that the defendant was involved in criminal activity. *Id.* at 676. The Court explained that headlong flight, "is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 676.

As defendant correctly points out, the Government's use of the term "avoid" to characterize the u-turn assumes facts not in evidence (Response at 12–13). Indeed, this Court rejects the Government's characterization of the u-turn as "avoidance" of or flight from the gate check. The facts of the *Wardlow* case are distinguishable from the circumstances of the case presently before this Court. In *Wardlow,* uniformed police officers observed the defendant standing next to a building holding an opaque bag in an area known for heavy narcotics trafficking. Apparently, when the defendant "looked in the direction of the officers," he turned and ran in the other direction. *Id.* at 675. Characterizing this action as flight and upholding the resulting stop, the Supreme Court took all these factors into consideration, specifically, the presence of defendant in an area known for drug trafficking, and defendant's action of looking in the direction of the officers and then running. The Court stated, "any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure. But unprovoked flight is simply not a mere refusal to cooperate.

not "controlled"—a person could turn around in a safe, legal manner); *Howard v. Voshell,* 621 A.2d 804, 807 (Del.Sup.Ct.1992) (no reasonable suspicion where, u-turn made 1,000 feet before a roadblock, because there existed "a lack of an identifiable way for a police officer to determine whether motorists 1,000 feet away from the checkpoint truly had notice of what law ahead to be significant"; the court specifically refused to adopt a per se rule making clear that "each case must be decided on its own facts."); *People v. Rocket,* 156 Misc.2d 641, 594 N.Y.S.2d 568 (1992) (no reasonable suspicion where motorist exited onto public road before checkpoint, relying on the analysis of *Murphy, Powell,* and *Howard*); *State v. Talbot,* 792 P.2d 489 (Utah App.1990) (no reasonable suspicion where, at 1:00 a.m. after cresting a hill, car stopped abruptly and turned around about 1,400 feet

from a roadblock consisting of two police cars stopped in the road with flashing lights, no signs giving notice as to what was occurring ahead, court found that at best the facts give rise to a "mere hunch.").

While the defendant acknowledged that some courts utilizing a totality of the circumstances approach have found stops justified, he correctly notes that those cases appear to have involved a u-turn much closer to the roadblock, than the 1500 feet here. *Steinbeck v. Commonwealth,* 862 S.W.2d 912 (Ky.App. 1993); *State v. Thill,* 474 N.W.2d 86 (S.D. 1991); *Commonwealth v. Eaves,* 13 Va.App. 162, 408 S.E.2d 925 (1991); *Stroud v. Commonwealth,* 6 Va.App. 633, 370 S.E.2d 721 (1988); *Snyder v. State,* 538 N.E.2d 961 (Ind. App.1989); *Smith v. State,* 515 So.2d 149 (Ala.App.1987); *Oughton v. Director of Revenue, State of Missouri,* 916 S.W.2d 462 (1996).

Flight, by its very nature is not 'going about one's business'; in fact, it is just the opposite." *Id.* at 676.

In contrast, the facts of the present case do not illustrate the type of behavior indicative of flight. The Government contends Sgt. Reid stopped defendant's vehicle because he believed "the defendant was attempting to avoid the gate check, and that this avoidance was motivated by criminal activity." However, other than a brief explanation of the heightened security alert that was in place at the time of the stop, the Government has failed to provide this Court with any basis, grounded in logic, extensive police experience or otherwise, from which Sgt. Reid formed his belief that the defendant's behavior was indicative of criminal activity.

It is true that in certain circumstances, factors each indicative of innocent behavior or travel may, when considered together, give rise to reasonable suspicion. *See Sokolow,* 490 U.S. at 10, 109 S.Ct. 1581 (1989) (holding that in determining whether reasonable suspicion exists for an investigative stop, " 'the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.' ") (quoting *Gates,* 462 U.S. at 243–44, 103 S.Ct. 2317). But, this case is also distinguishable from cases in which the factors considered in their totality are inconsistent with innocent travel. For example, in *United States v. Brugal,* 209 F.3d 353 (4th Cir.2000), the defendant had exited from I–95 immediately after passing two decoy drug checkpoint signs at 3:30 a.m. The exit, however, showed no signs of activity, such as hotels, convenience stores or gas stations, that would support innocent intentions for exiting the interstate. *Id.* at 360. Therefore, the Court determined that the totality of the circumstances "eliminate a substantial portion of

innocent travelers." *Id.* As such, the Court held the police trooper possessed reasonable suspicion to stop defendant's car. *Id.*

Here, the facts in their totality do not demonstrate that defendant in fact executed the u-turn specifically to *avoid* the check point. As it marked an entrance to a military base, it is quite possible the defendant simply did not wish to enter the base. It does not seem unlikely that an innocent traveler could drive over the crest of the hill and, upon seeing the gate check, realize he is heading toward a military installation and decide to turn around. The lateness of the hour arguably supports the possibility that one would be lost with no intention of entering onto the military base. Moreover, "there is no evidence that [defendant] drove fast, as if running away . . ." *U.S. v. Ogilvie,* 527 F.2d 330, 332 (9th Cir.1975).

In light of the facts presented, therefore, it is unreasonable to presume the defendant executed the u-turn with the explicit intention of avoiding the gate check. *Accord United States v. Beckman,* 3 F.Supp.2d 654 (D.Md.1998) (holding a vehicle stop violated the Fourth Amendment where a u-turn was not executed illegally and no exceptional circumstances existed). The Government has failed to show the illegality of the u-turn or other driver behavior or any exceptional circumstances existed here.

It is true that courts must avoid the business of second-guessing the practical experience of law enforcement officers who observe street activity on a daily basis. *See United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993); *see also United States v. Brugal,* 209 F.3d at 359 (noting that the trooper's eighteen years of experience was significant in the totality of factors that amounted to reasonable suspicion). However, in the present case the Government

did not present the Court with the basis of Sgt. Reid's belief. There is simply no articulated logic to which this Court can defer.

The government has explained that because there are no guards posted at any of the entrances to the Ft. Meade installation, "it is imperative that the Military Police conduct regular 'gate checks' to ensure that the installation, its property, and its personnel are protected, and that applicable laws and regulations are enforced." (Opposition at 1.) The Government argues that in light of the terrorist threats on the United States Government and the heightened security measures, defendant's u-turn could reasonably be interpreted as suspicious activity.

However, once defendant executed the u-turn and headed in the direction away from the installation, the purpose of the gate check had been fulfilled, eliminating any necessity to stop defendant's vehicle. A vehicle heading away from a military installation does not pose a threat to the personnel, property and information located on the installation on the other side of the access control point. Defendant's change of direction did not defeat the purpose of the roadblock, but effectuated it in its deterrence of entrance.

## CONCLUSION

Based on the facts presented and the arguments submitted at the hearing, this Court finds that no specific, individualized articulable suspicion existed under the totality of the circumstances to justify Sgt. Reid's *Terry* stop of the defendant. Consequently, all evidence obtained subsequent to the stop is inadmissible, and the case against defendant dismissed.