**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Dennis Deon SMITH, Defendant–**
**Appellant.**

No. 04–4311.

United States Court of Appeals,
Fourth Circuit.

Argued: Dec. 3, 2004.

Decided: Feb. 10, 2005.

the officers possessed reasonable suspicion to stop Smith's vehicle, we affirm.

ARGUED: William Stimson Trivette, Assistant Federal Public Defender, Office of the Federal Public Defender, Greensboro, North Carolina, for Appellant. Michael Francis Joseph, Assistant United States Attorney, Office of the United States Attorney, Greensboro, North Carolina, for Appellee. ON BRIEF: Louis C. Allen, III, Federal Public Defender, Greensboro, North Carolina, for Appellant. Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

Before WILKINS, Chief Judge, and NIEMEYER and DUNCAN, Circuit Judges.

Affirmed by published opinion. Chief Judge WILKINS wrote the opinion, in which Judge NIEMEYER and Judge DUNCAN joined.

## WILLIAM W. WILKINS, Chief Judge:

Dennis Deon Smith appeals a district court order denying his motion to suppress evidence obtained by police following an investigatory stop of his vehicle. Because

## I.

During the early morning of March 19, 2003, Durham, North Carolina police officers established a driver's license checkpoint on Highway 54. The checkpoint, which was established in response to numerous break-ins and traffic violations in the area, was located at the bottom of a small hill and was operated by five officers, each with a patrol vehicle, from around 2:00 a.m. until shortly after 3:00 a.m. During this time, the police lights on each patrol vehicle were activated, and all motorists traveling in either direction were stopped.

At approximately 3:05 a.m., a vehicle traveling west on Highway 54 crested the hill about 985 feet from the checkpoint. According to the officers, the vehicle "appeared to slam on its brakes," J.A. 24, 55, because its headlights "dipped down toward the ground," *id.* at 55. The officers then observed the vehicle turn left onto a private gravel driveway leading to a single residence. The entrance to the driveway was located about 810 feet from the checkpoint.

Based on these observations, Officer Clyde McCoy drove his patrol vehicle to the driveway to investigate. When McCoy turned into the driveway, he observed that the suspect vehicle, a Lexus sedan, was stopped just before a sharp left curve in the driveway, approximately 240 feet from the highway. Either before or after entering the driveway, McCoy activated his police lights.[1] Rather than remaining

---

1. The record is unclear on this point. Officer McCoy testified that he activated his police lights after he entered the driveway and saw the Lexus stopped there, but a second officer who followed McCoy to the driveway testified that the officers drove from the checkpoint to the driveway with their lights already on. The district court did not resolve this issue, concluding that it did not affect the resolution of Smith's motion to suppress. We agree

stopped, however, the Lexus "proceeded slowly around the curve." *Id.* at 26. When McCoy drove around the curve, he saw the Lexus stopped at the end of the driveway with its lights off.[2]

McCoy pulled up behind the Lexus and exited his patrol vehicle. He then approached the Lexus and asked its driver and only occupant, Smith, for his driver's license. Smith responded that he did not have a license. McCoy asked Smith if he lived at the residence; Smith replied that he did not. Smith told McCoy that he had turned off of the highway "because he saw the patrol vehicles down the street and thought there was an accident." *Id.* McCoy asked Smith to step out of his vehicle and handcuffed him. After verifying by radio that Smith's license had been revoked, McCoy placed Smith under arrest.

A second police officer who had followed McCoy to the scene then asked Smith for permission to search the Lexus. Smith replied that "he didn't care, it wasn't his vehicle." *Id.* at 60. Police searched the vehicle and discovered a loaded magazine for a 9–millimeter handgun and a small quantity of cocaine base. After advising Smith of his *Miranda* rights,[3] officers asked him about the weapon to which the magazine belonged. Smith responded that he had thrown a handgun out of the vehicle near the entrance to the driveway. Although the officers found no handgun in the area Smith described, they eventually recovered a Ruger 9–millimeter pistol near the Lexus at the end of the driveway. Smith was then transported to the police station. After receiving his *Miranda* warnings in writing, Smith stated that the pistol belonged to a friend who had died and that he kept the weapon because he was uncertain what to do with it.

Smith was subsequently charged with possession of a firearm by a convicted felon, *see* 18 U.S.C.A. § 922(g)(1) (West 2000). He pleaded not guilty and moved to suppress the evidence obtained following the vehicle stop, arguing that the officers lacked reasonable suspicion to justify the stop. The district court held that the officers had reasonable suspicion to stop Smith's vehicle because it (1) turned abruptly into a private driveway before reaching the police checkpoint and (2) moved—from a stopped position—around the curve of the driveway "as far as it could go," J.A. 83, in response to McCoy's police lights. The court concluded that based on the totality of the circumstances, the officers reasonably suspected that Smith was attempting to avoid the police checkpoint to conceal his involvement in criminal activity. The district court therefore denied Smith's motion to suppress.

Smith subsequently entered a conditional guilty plea pursuant to a plea agreement. The district court sentenced Smith to 60 months in prison.

## II.

■ Smith contends that the district court erred in denying his motion to suppress, arguing that the stop of his vehicle violated the Fourth Amendment because the officers lacked reasonable suspicion that he was engaged in criminal activity. Whether the stop of Smith's vehicle was based on reasonable suspicion is a mixed

with this assessment and thus will not address the issue further.

2. It is not clear from the record how far the Lexus traveled from its original stopped position just before the curve until reaching its final position at the end of the driveway. Nevertheless, it appears that the vehicle moved, at most, approximately 120 feet.

3. *See Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

question of law and fact that we review de novo. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

 The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. And, it is well settled that a search conducted without a warrant is per se unreasonable unless it falls within one of the "well-delineated exceptions" to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception is the authority of law enforcement officers to effect a limited investigatory detention when they possess "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam); *see Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A reasonable, articulable suspicion is "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas,* 517 U.S. at 696, 116 S.Ct. 1657 (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). In determining whether a detention is supported by reasonable suspicion, we look to the circumstances known to the officer and "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. In so doing, we must consider "the totality of the circumstances—the whole picture." *Cortez,* 449 U.S. at 417, 101 S.Ct. 690.

## A.

Emphasizing the general principle that individuals have a right to avoid encounters with the police, *see, e.g., United States v. Burton,* 228 F.3d 524, 527, 528–29 (4th Cir.2000), Smith asserts that a motorist "should be free to avoid a police encounter at [a] roadblock by stopping and turning around, so long as he does so legally." Br. of Appellant at 21. Smith argues that a motorist's legal turn to avoid a police roadblock cannot create reasonable suspicion of criminal activity because the driver may be turning away from the roadblock for innocent reasons. By contrast, the Government maintains that when police reasonably suspect that a driver is attempting to avoid a roadblock, they may stop the driver to ascertain the reason for that avoidance.

We find instructive the decision of the Supreme Court in *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In *Wardlow,* two Chicago police officers were part of a police caravan patrolling a high-crime area investigating drug transactions. *See Wardlow,* 528 U.S. at 121, 120 S.Ct. 673. One officer observed Wardlow standing next to a building holding an opaque bag. *See id.* at 121–22, 120 S.Ct. 673. Wardlow looked in the officers' direction and fled. *See id.* at 122, 120 S.Ct. 673. The officers followed Wardlow in their patrol vehicle and eventually stopped him. *See id.* Upon conducting a protective patdown search of Wardlow, the officers discovered a loaded handgun in Wardlow's bag and arrested him. *See id.* After moving unsuccessfully to suppress the handgun, Wardlow was convicted of a weapons charge in Illinois state court. *See id.* The Illinois appellate courts, however, reversed Wardlow's conviction on Fourth Amendment grounds, holding that the weapon should have been suppressed because the officers lacked reasonable suspicion to stop Wardlow. *See id.* at 122–23, 120 S.Ct. 673.

The Supreme Court reversed. The Court initially noted that Wardlow's presence in a high-crime area, while not dispositive, was a relevant factor in the rea-

584

sonable suspicion analysis. *See id.* at 124, 120 S.Ct. 673. The Court explained that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* More importantly, the Court recognized, the officers became suspicious of Wardlow based on "his unprovoked flight upon noticing the police." *Id.* Noting that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," the Court emphasized that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* The Court thus determined that the officers were "justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further." *Id.* at 125, 120 S.Ct. 673.

The Supreme Court observed that its holding was consistent with the principle that "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). The Court explained that the case before it—involving an individual who fled upon seeing police—was different from cases in which an individual merely chooses not to talk to police and continues his normal activities:

> [U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Id.*

*Wardlow* also rejected the argument that flight from police cannot establish reasonable suspicion of criminal activity because that flight may be motivated by innocent reasons. The Court pointed out that the conduct observed by the officers in *Terry*—two individuals pacing in front of a store, peering into the window, and conferring with each other—"was ambiguous and susceptible of an innocent explanation." *Id.* Nevertheless, because this conduct "also suggested that the individuals were casing the store for a planned robbery," *Terry* held that the officers could stop the individuals "to resolve the ambiguity." *Id.* "In allowing such detentions," the Court explained, "*Terry* accepts the risk that officers may stop innocent people." *Id.* at 126, 120 S.Ct. 673.

■■ We believe that the principles of *Wardlow* apply to evasive conduct by drivers approaching a police roadblock. As with an individual who encounters police on foot, "[h]eadlong flight" or other "nervous, evasive behavior" in response to a roadblock may contribute to reasonable suspicion that the driver is engaged in criminal activity. *Id.* at 124, 120 S.Ct. 673. Such evasive behavior is "not going about one's business," *id.* at 125, 120 S.Ct. 673 (internal quotation marks omitted), but instead suggests that the driver is avoiding the roadblock for other than innocent reasons, *see id.* at 124–25, 120 S.Ct. 673. Indeed, we have repeatedly recognized that evasive reactions to the presence of police may be considered in determining whether reasonable suspicion exists for an investigatory stop. *See United States v. Sims*, 296 F.3d 284, 287 (4th Cir.2002) (holding that defendant's evasive behavior—which reasonably suggested he was hiding from officers and not simply "going about his business"—supported finding of reasonable suspicion for investigatory stop (alter-

ation & internal quotation marks omitted)); *United States v. Brugal*, 209 F.3d 353, 360–61 (4th Cir.2000) (en banc) (plurality opinion) (concluding that officers had reasonable suspicion to stop vehicle that immediately exited interstate after passing "decoy" signs indicating drug checkpoint was ahead, in part because area surrounding exit was deserted when vehicle exited at 3:30 a.m.); *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir.1997) ("Evasive conduct can, of course, assist an officer in forming reasonable suspicion."); *see also United States v. Humphries*, 372 F.3d 653, 657, 660 (4th Cir.2004) (explaining, in context of probable cause analysis, that officers may consider "evasive conduct that falls short of headlong flight," such as walking away from approaching officers at a quick pace and ignoring commands to stop). We therefore hold that when law enforcement officers observe conduct suggesting that a driver is attempting to evade a police roadblock—such as unsafe or erratic driving or behavior indicating the driver is trying to hide from officers—police may take that behavior into account in determining whether there is reasonable suspicion to stop the vehicle and investigate the situation further. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1138–39 (9th Cir.2000) (en banc) (holding that U-turn of defendants' vehicles shortly before reaching border checkpoint, combined with other factors, including fact that vehicle subsequently stopped on side of highway in isolated area, provided reasonable suspicion for investigatory stop); *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir.1996) (holding that defendant's apparent attempt to avoid roadblock by turning into parking lot was a factor supporting reasonable suspicion to stop vehicle); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (explaining that among other factors officers may consider in determining whether reasonable suspicion exists to stop a vehicle near the border,"[t]he driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion").

## B.

■ Having concluded that evasive behavior by a motorist approaching a police roadblock may contribute to a reasonable suspicion of criminal activity, we now consider whether, based on the totality of the circumstances here, the officers possessed a reasonable suspicion that Smith was engaged in criminal activity. For the reasons that follow, we conclude that they did.

■ The officers observed Smith's vehicle brake abruptly and turn suddenly into a private gravel driveway. Smith's erratic driving and the nature of the road onto which he turned could have reasonably suggested to the officers that Smith was attempting to evade the roadblock rather than simply "going about [his] business," *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673 (internal quotation marks omitted). *See Steinbeck v. Commonwealth*, 862 S.W.2d 912, 914 (Ky.Ct.App.1993) (finding reasonable suspicion for investigatory stop when, at 3:15 a.m., defendant's vehicle turned onto unpaved and uninhabited road before reaching roadblock). Upon further investigation, Officer McCoy observed Smith's vehicle stopped in the middle of the driveway, more than 200 feet from the public road but still some distance from the residence. McCoy could have reasonably inferred from this observation that Smith was attempting to evade the police checkpoint by hiding in the driveway and was not simply turning into the driveway because he lived there or because he was turning around to avoid the checkpoint for innocent reasons, such as a belief that an accident was ahead. *See Smith v. State*,

515 So.2d 149, 150, 151 (Ala.Crim.App. 1987) (holding that investigatory stop of defendant's vehicle was justified when officer observed vehicle come around a curve approximately 200 yards from roadblock, turn rapidly into a private driveway, and stop 50 feet from a residence with its lights off but engine running); *State v. D'Angelo*, 605 A.2d 68, 70–71 (Me.1992) (finding reasonable suspicion when defendant's vehicle turned into private driveway 75 yards before checkpoint, officer knew some residents of home but had never seen defendant's vehicle parked there, and occupants of vehicle did not exit after stopping engine and turning off lights but instead turned to observe police activities); *State v. Foreman*, 351 N.C. 627, 527 S.E.2d 921, 922–23 (2000) (concluding that officer possessed reasonable suspicion when defendant's vehicle made abrupt turn before reaching checkpoint, made second abrupt turn, and parked in residential driveway with its lights and engine off).[4] And although McCoy had activated his police lights, Smith's vehicle did not remain stopped—as one would expect of a driver who turned away from the roadblock for innocent reasons—but instead

proceeded around the curve in the driveway. As the district court recognized, this additional evasive behavior gave McCoy further reason to believe that Smith might be engaged in criminal activity. *See Watkins v. City of Southfield*, 221 F.3d 883, 889 (6th Cir.2000) ("[T]he fact that [the defendant] refused to stop when [officers turned on their police lights] contributed to the officers' suspicion that criminal activity may have been afoot."); *United States v. Lyles*, 946 F.2d 78, 80 (8th Cir. 1991) (considering, in reasonable suspicion analysis, the fact that "[w]hen the officers stopped behind the [defendants'] car and turned on the flashing red lights, the car began to drive away"); *United States v. Walraven*, 892 F.2d 972, 975–76 (10th Cir. 1989) (holding that reasonable suspicion existed for investigatory stop in part because vehicle failed to stop promptly in response to police lights). Thus, by the time Smith finally submitted to McCoy's display of authority by stopping at the end of the driveway, McCoy had observed Smith engage in a series of evasive actions—all inconsistent with innocent reasons for avoiding the roadblock.[5] And, all

---

4. McCoy could not recall whether Smith's vehicle lights were off when he was stopped before the curve in the driveway, but McCoy testified that Smith's lights were off when he finally stopped at the end of the driveway.

5. The district court concluded that because Smith moved his vehicle around the curve in the driveway in response to McCoy's police lights, Smith was not seized for Fourth Amendment purposes until he finally stopped at the end of the driveway. Smith challenges this finding, asserting that he was seized when McCoy first pulled into the driveway because at that point McCoy displayed his police lights and blocked Smith from exiting the driveway. Smith thus contends that the district court erred in considering the subsequent movement of his vehicle around the curve as an additional factor supporting reasonable suspicion. We reject this argument.

The Supreme Court has held that a suspect is not seized within the meaning of the Fourth Amendment until officers apply physical force or the suspect submits to a show of authority. *See California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). When an officer asserts his authority but the suspect does not yield to that authority, there is no seizure. *See id.; see also United States v. Scheetz*, 293 F.3d 175, 183 (4th Cir.2002) (holding that defendant was not seized in connection with police checkpoint because he executed an illegal U-turn to avoid checkpoint); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993) (explaining that an officer's "show of authority in calling for the defendant to stop is not a seizure when the defendant does not yield to that authority"). When McCoy pulled into the driveway behind Smith with his police lights visible, Smith responded not by keeping his vehicle stopped but instead by driving it around the curve,

of this conduct occurred at 3:05 a.m., compounding the suspiciousness of Smith's behavior. *See United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993) (explaining that "[t]he lateness of the hour is another fact that may raise the level of suspicion"). We conclude that these facts, viewed in their totality, provided the officers with reasonable suspicion that Smith may have been engaged in criminal activity, thus permitting them to stop his vehicle to investigate that suspicion.

Smith cites *United States v. Ogilvie*, 527 F.2d 330 (9th Cir.1975), and *United States v. Lester*, 148 F.Supp.2d 597 (D.Md.2001), in arguing that his reaction to the roadblock, involving a legal turn off the highway, could not create reasonable suspicion of criminal activity. But here, the officers observed a series of evasive actions by Smith, while no such facts were present in either *Ogilvie* or *Lester*. The defendant in *Ogilvie* simply exited the interstate before reaching a roadblock, drove over the overpass, and resumed traveling in the opposite direction. *See Ogilvie*, 527 F.2d at 331. The Ninth Circuit emphasized that "Ogilvie's actions in turning off the highway and turning around were not in themselves suspicious" and that no evidence showed that "Ogilvie drove fast, as if running away, disobeyed any traffic laws, or otherwise drove in an unusual or erratic manner." *Id.* at 332; *see Montero–Camargo*, 208 F.3d at 1137 (explaining that "*Ogilvie* simply holds that a turnaround alone is not enough in and of itself to create reasonable suspicion," but that later Ninth Circuit decisions had made clear that "a turnaround combined with other factors may be considered as part of a reasonable suspicion analysis"). Similarly, in *Lester*, there was no evidence that the defendant—who executed a U-turn before reaching a military checkpoint—drove erratically or unsafely or "display[ed] any other behavior that rose to the level of suspicion necessary to justify a *Terry* stop." *Lester*, 148 F.Supp.2d at 605.[6]

## III.

For the reasons set forth above, we affirm the order of the district court denying Smith's motion to suppress evidence.

*AFFIRMED*

apparently out of McCoy's view. As the district court recognized, although Smith may have been blocked in when McCoy entered the driveway, there is no indication that, at the moment he began driving the Lexus around the curve, Smith knew that the driveway dead-ended within a short distance. Also, after driving around the curve, Smith likely could have exited the vehicle and attempted to flee on foot. Thus, the district court did not err in concluding that Smith was not seized until he finally submitted to McCoy's show of authority by stopping at the end of the driveway.

6. Smith also cites a number of state decisions that he claims "have generally followed the rule of *Lester* and *Ogilvie*." Br. of Appellant at 13. We note that most of these decisions turn on their specific facts and generally distinguish between situations in which the record reflects evasive conduct by the defendant and those in which it does not. Moreover, Smith emphasizes two factors that some of these decisions have identified as relevant to determining whether a driver is attempting to evade a roadblock: (1) the distance between the driver's turn and the roadblock (here, 810 feet) and (2) whether notice of the roadblock was posted (here, it was not). Although these factors might be important in other cases, we decline to place significant weight on them here. The officers' observations of Smith's multiple evasive actions in response to the presence of police strongly suggested that he was attempting to avoid the roadblock for other than innocent reasons.